ROCKHILL et al. v. CREER

No. 3367. Decided April 13, 1920. (189 Pac. 668.)

1. APPEAL AND ERROR—JUDGMENT IN EQUITABLE ACTION MAY BE REVERSED IF AGAINST CLEAR WEIGHT OF EVIDENCE. An appeal, in an action at law, which under the issues has become an equitable action, brings up for review questions of both law and fact, and if the findings and judgment of the trial court are against the clear weight of the evidence, it must be reversed, even though there should be some substantial evidence to support the findings and judgment.[1]

2. CORPORATIONS—STATEMENT INDUCING NOTE IN PAYMENT OF STOCK HELD WARRANTY THAT COMPANY WAS IN GOOD FINANCIAL CONDITION. In an action on a note, brought by the holder's personal representatives, wherein defendant alleged false representations in the procuring of the note, which was given for corporate stock, a statement by the holder, purporting to represent the financial condition of the corporation verbally guaranteed by the holder to be correct, *held* to amount to an express warranty that the company was in good financial condition.

3. CORPORATIONS—EVIDENCE HELD TO SHOW THAT WHEN NOTE IN PAYMENT FOR STOCK WAS EXECUTED, COMPANY WAS INSOLVENT TO

KNOWLEDGE OF HOLDER. In an action by the personal representatives of the holder of a note given for corporate stock in a company represented by the holder to be in good financial condition, wherein fraud was interposed as a defense, evidence *held* to show that at the time of the execution of the note the company was hopelessly insolvent to holder's knowledge.

4. CORPORATIONS—PARTICIPATION IN MANAGEMENT AND DIVIDENDS HELD NOT TO ESTOP MAKER OF NOTE FOR STOCK FROM SETTING UP DEFENSES. That the maker of a note given for corporate stock took active part in the management of the company, accepted dividends, and insisted on an assignment for the benefit of all the company's creditors did not estop him, in an action on a note given by him for corporate stock, to contend that the note was obtained by false representations, that it has not been delivered, and that there was no consideration therefor.

5. CORPORATIONS—REMEDIES OF PURCHASER OF STOCK WHO HAS BEEN MISLED BY SELLER'S FRAUD ENUMERATED. A purchaser of corporate stock, who has been imposed upon by the fraud of the seller, may rescind the contract restoring what he has received, and recover what he has parted with, or he may retain the property and sue for damages for deceit, or he may retain the property, and in action by the seller for the purchase price may be allowed damages for deceit.

6. EXECUTORS AND ADMINISTRATORS—CLAIM NOT PRESENTED CANNOT BE SET OFF IN ACTION BY PERSONAL REPRESENTATIVES. In an action by personal representatives on a note given decedent for corporate stock alleged by defendant to have been obtained by false representations, defendant cannot counterclaim for the amount paid, where he has not presented a claim against the estate, in view of Comp. Laws 1917, section 6576, defining counterclaims, section 7645, requiring notice to creditors, section 7648, providing that all claims must be presented within time limited, and section 7653, providing that, if rejected, suit must be brought within three months.

Appeal from District Court, Fourth District, Utah County; *H. N. Hayes,* Judge.

Action by Martha O. Rockhill and another, administratrix and administrator of the estate of A. B. Rockhill, deceased, against William O. Creer, to recover on a promissory note, with counterclaim by defendant. Judgment for plaintiffs, and defendant appeals.

JUDGMENT VACATED, AND ACTION AND COUNTERCLAIM DIS--
MISSED.

*Wedgwood, Irvine & Thurman,* of Salt Lake City, for
appellant,

*Elias Hansen,* of Spanish Fork, for respondents.

[1] *Clawson* v. *Wallace,* 16 Utah 300, 52 Pac. 9; *Schroeder* v. *Pratt,*
21 Utah 176, 60 Pac. 512; *Tuckfield* v. *Crager,* 29 Utah 472, 82 Pac.
860; *Crosby* v. *Anderson,* 49 Utah 167, 162 Pac. 75; *Lake Shore Duck
Club* v. *Lake View Duck Club,* 50 Utah 77, 150 Pac. 309.

AGEE, District Judge.
The respondents, as the legal representatives of A. B.
Rockhill, deceased, brought this action in the district court
of Utah county to recover a judgment against the appellant
on a promissory note for $1,875 dated January 27, 1912,
payable to said A. B. Rockhill or order on or before Novem-
ber 27, 1913, with seven per cent. interest. The complaint
was in the usual form. The appellant answered, admitting
the signing, but denying the delivery, of the note, and
denying that he received any consideration for said note, and
alleging, in substance, that on the 27th day of January,
1912, said A. B. Rockhill, being a stockholder in Young
Men's Company, hereinafter called "the company," entered
into negotiations with the appellant for the sale to appellant
of 625 shares of the capital stock of said company, and
in order to induce the appellant to buy said shares
of stock represented to appellant that the company was
a going concern and solvent, and had sufficient money on
hand to pay a dividend of six per cent. on its capital stock,
and at the same time presented a purported list of the
assets and liabilities of the company, showing the assets
of the company to be $64,200.45 and the liabilities to be
$62,427.92, including its capital stock and surplus; that.
relying on said representations of said Rockhill, he agreed
to purchase 625 shares of said capital stock from said Rock-
hill for $3,125, and paid to Rockhill $1,250 in cash as a

part of the purchase price, and made the note in question for the balance of said purchase price; that Rockhill caused the 625 shares of stock to be transferred to appellant on the books of the company, and also caused a certificate of stock to be issued in the name of the appellant, and that said note and certificate were deposited with the Commercial Bank of Spanish Fork, to be held by it until the amount of said note should be paid, when the certificate of stock should be delivered to appellant.

Appellant further alleged in his answer that said representations were untrue, and that said statement of the assets and liabilities of the company was also untrue, and that at the time the company was insolvent and owed a large sum of money that it could not pay, which facts were unknown to him, and that the said stock was valueless, all of which was known to Rockhill, and that said false representations were made by Rockhill for the purpose of inducing the appellant to buy said stock, and that appellant relied on said representations, and would not have executed said note or paid said money had he not relied on said representations; that said stock was never delivered to him, and that there were no funds on hand properly applicable to the payment of dividends. He admits that he received $375 as dividends, but alleges that he paid $131.25 interest on said note before he ascertained the falsity of the repre-sentations, and prayed judgment against the respondents for the cancellation of the note and for $1,006.25, with interest from January 27, 1912, and costs.

To this answer and counterclaim the respondents filed a reply in which they admitted that said note and certificate of stock were left with said bank, and alleged that they were so left under the following agreement:

"January 27, 1912.

"Escrow and Agreement.

"The inclosed stock certificates are to be released to the men in whose names they are made immediately on the payment of their notes which are attached to said certificates. Said certificates are to remain with the Commercial Bank of Spanish Fork until the

said attached notes are paid to the person in whose name they are made or until the said notes become due.     William O. Creer.

"Wm. B. Hughes.

"A. B. Rockhill."

They further alleged, in substance, that Rockhill was at all times ready and willing to deliver said certificate of stock to appellant upon the payment of said note, and that said bank was ready and willing at all times to deliver said stock to appellant on the payment of said note, and that they had always been ready and willing to deliver said stock on the payment of said note. They further alleged, in substance, that immediately after said stock was transferred on the books of the company appellant became a director of the company, took an active part as such in the management of the business, and insisted that the company should make an assignment for the benefit of its creditors, and that such assignment was made on May 6, 1913, and that by reason of said facts appellant is estopped from setting up the defenses pleaded.

There was a trial to the court, resulting in a judgment in favor of the respondents on all the issues, from which appellant prosecutes this appeal.

There are numerous assignments of error, but in the view we take of the matter the only assignments we need to consider are those challenging the sufficiency of the evidence to support the findings and judgment. The trial court found, in substance, that Rockhill represented that the company had assets in the sum of $64,200.45, and that its liabilities were $62,427.92, including $25,350 capital stock and $6,713.74 surplus; that said representations were substantially correct; and that Rockhill and respondents had at all times been ready and willing to deliver said stock on payment of said note.

The trial court and counsel for both parties appear to have proceeded on the theory that, although in the beginning the action was one at law, under the issues joined it became an equitable action. In this we think they were correct. It follows that the appeal brings to this court for

review questions of both law and fact, and if the findings and judgment of the trial court are against the clear weight of the evidence it must be reversed, even though there should be some substantial evidence to support such findings and judgment. *Clawson* v. *Wallace*, 16 Utah, 300, 52 Pac. 9; *Schroeder* v. *Pratt*, 21 Utah, 176, 60 Pac. 512; *Tuckfield* v. *Crager*, 29 Utah, 472, 82 Pac. 860; *Crosby* v. *Anderson*, 49 Utah, 167, 162 Pac. 75; *Lake Shore Duck Club* v. *Lake View Duck Club*, 50 Utah, 77, 160 Pac. 309, L. R. A. 1918B, 620. If the statute in reference to the foreclosure of mortgages upon personal property which provides that there can be but one form of action to recover in such cases is applicable to a case where the debt is secured by pledge, which seems to have been assumed in *Coburn* v. *Bartholomew*, 50 Utah, 566, 167 Pac. 1156, but which to the writer seems doubtful, it seems clear that this action could not be maintained in its original form. However, in the view we take of this case, it is unnecessary to decide that question.

That Rockhill made the representations alleged in the answer as to the solvency of the company, the value of its assets, and the extent of its liabilities does not seem to be seriously questioned by respondents, and the trial court found that Rockhill represented to appellant that the company had assets in the sum of $64,200.45, and that its liabilities, including $25,350 capital stock and $6,713.74 of surplus, amounted to the sum of $62,427.92. This would show liabilities to others than the stockholders of $30,364.18. It is conceded by respondents that there were liabilities to the amount of $996.70 in excess of this amount. The court also found that there was "a discrepancy" of $196.70 in the amount of the assets, and that there was a sum of $126.40 less merchandise than was contained in the statement. But it also found that the statement of assets and liabilities furnished by Rockhill to appellant was substantially correct, and that Rockhill stated that he would make good any amount that the property of the company fell below the amount stated. The court further found that the stock was not valueless, that Rockhill

Appeal from Fourth District

did not know that the representations which were made to the appellant were untrue and that they were not untrue except as to the discrepancies as to the amount of the property and the liabilities, to which we have referred, and that the representations were not fraudulent.

W. A. Banks, a witness for appellant, testified:

"On or about the month of January, 1912, and for some time prior thereto, I was secretary and treasurer of the Wasatch Construction Company, and had the office in the Commercial Club building in Salt Lake City, under the direction of Mr. Creer. About the first of the year 1912, and prior to January 27th, I saw Mr. Rockhill at this office. It was in January. I do not remember the exact date. I saw him there at two different times. At those times I heard conversations relating to the sale or purchase of shares of stock in the Young Men's Company between Mr. Creer and Mr. Rockhill. The first time Mr. Rockhill was in the office he told Mr. Creer that the company had been paying 6 per cent. dividends the last few years, and that the company was in a very good financial condition, and considered it a very good buy. Mr. Rockhill made the offer to sell to Mr. Creer for fifty cents on the dollar. He said that it had been paying six per cent. dividends, and on the face of that Mr. Creer took the stand that that would be paying on the basis of twelve to fourteen per cent., which would be a good buy. That was the substance of what Mr. Rockhill said and what Mr. Creer said. The second conversation was shortly after. The second time he came in he brought what he said was the statement of the assets and liabilities of the company. He handed it to Mr. Creer, and Mr. Creer handed it to me, and I looked it over, and then Mr. Creer suggested going into the adjoining office, which is Mr. Hughes' office, and they went in there. As I recall it D. B. Hughes, William B. Hughes, Mr. Creer, Mr. Rockhill, and myself were there. Mr. Creer handed Mr. William B. Hughes the statement, and Mr. Hughes said to Mr. Creer: 'Don't you think we had better go down and go more in detail in this matter?' and Mr. Creer said, 'Mr. Rockhill says this is correct, and will guarantee this statement to be correct, and that is good enough for me,' and Mr. Hughes said 'All right then.' That is the substance of it, but there was more said in connection with it."

This testimony is not disputed, and is corroborated in every material feature by three other witnesses. The statement referred to in the testimony is as follows:

Rockhill et al. v. Creer, 56 Utah 119

Defendant's Exhibit 3.

Yearly Statement of the Young Men's Company Taken Jany. 23, 1912.

| Resources. | | Liabilities. | |
|---|---|---|---|
| Mdse. on hand | $29,454 70 | Capital stock | $25,350 00 |
| Grain on hand | 406 60 | Owing bank | 8,000 00 |
| Alfalfa seed | 1,877 06 | Owing for mdse | 10,256 84 |
| Book accounts | 6,471 17 | Borrowed money | 11,357 94 |
| Notes | 2,256 63 | Dividends not drawn | 749 40 |
| Judgments | 2,441 31 | Surplus | 6,713 74 |
| Buildings | 17,500 00 | Surplus | 1,772 53 |
| Real estate | 2,500 00 | | |
| Cash on hand | 1,292 98 | | $64,200 45 |

$64,200 45

Balance gain ........$ 1,772 53

This statement, in connection with the representations made by Rockhill, undoubtedly amounted to an express warranty that the assets of the company were of the value of $64,200.45, that the liabilities did not exceed $62,427.92, and that the company was not only solvent, but was in good financial condition.

Mechem on Sales says (section 1235):

"In order to constitute an express warranty no particular language is necessary. It is not required that it shall be in writing, or be made in specific terms; and it is not at all necessary that the word 'warrant' or 'warranty' shall be used. Any direct and positive affirmation of a matter of fact, as distinguished from a mere matter of opinion or judgment, made by the seller during the treaty of sale and as a part of the contract, designed by him to induce the action of the purchaser and actually to some extent at least, relied upon by the latter in making the purchase, will be deemed to be a warranty."

Section 1237: "It is not necessary, according to the clear weight of authority, that the seller shall actually have intended this representation to be a warranty. If he uses language which in law amounts to a warranty, and the buyer relies on it as such, the seller cannot escape responsibility upon the ground that he had no intention to warrant."

Section 1239: "So that the seller made the representation in entire good faith, believing it to be true, is no defense. His good or bad faith may be material where the right to rescind or maintain an action for deceit is the point in issue, but the seller is none the less liable upon his warranty because he honestly believed the fact to be as stated."

Speaking of the difference between an expression of opinion which will not, and a statement of fact, which will, amount to a warranty, the same author in section 1242 uses this language:

"But in the latter case a positive affirmation made by the seller for the purpose of inducing the sale, and relied upon by the buyer, will be deemed to be a warranty, even though under other circumstances it might be deemed an expression of opinion merely."

The trial court seems to have treated this statement of assets and liabilities as an invoice, of the property, or as a statement of its book value, and to have proceeded on the theory that the controlling question was whether or not this statement truthfully set forth the value of the assets and the amount of the liabilities as shown by the books of the company. In this the court was in error. What appellant was interested in knowing was whether or not the company was solvent and in good financial condition, as Rockhill had declared it to be. As a corroboration of his representations on this subject, Rockhill produced this statement and guaranteed its correctness. This statement was in no sense an invoice, but only a summary purporting to show the value of the assets and the liabilities of the company, or, in other words, its financial condition. It did not contain a list of the various items of merchandise with the cost or invoice price so that appellant could investigate and determine for himself as to the correctness of the value stated. It did not contain a list of the persons indebted to the company on notes or accounts, or against whom the company had judgments, with the amount due from each, so that appellant could ascertain as to their solvency and the value of the notes, accounts, and judgments, but a statement of their aggregate value. It did not contain a description of the real estate owned by the company, leaving appellant to determine the value, but stated the value to be $20,000, and Rockhill expressly undertook to make good any deficiency. Under these circumstances appellant had the right to rely on the truthfulness of Rockhill's statements and the correctness of this statement as to the value of the assets and the amount

of its liabilities, and was not required to make any investigation on the subject. · Mechem on Sales, 1841.

Was the company solvent, and did the statement in question correctly reflect the financial condition of the company? Article 16 of the charter of the company, and excerpts from the minutes of certain meetings of the directors and of the stockholders of the company, are illuminative on this question. It appears that the company was incorporated in December, 1909. Article 16 is as follows:

"The consideration upon which our subscription is based, to the shares of the capital stock in this corporation, is our interest in the capital stock of the late Young Men's Consolidated Co-operative Institution, the stock in trade, with goods, wares and merchandise, now on hand, valued approximately in the sum of nine thousand five hundred dollars. Also the real estate now owned by said institution, and to which we according to our number of shares in the capital stock of said institution and owners, do convey to this corporation as part payment for the number of shares subscribed by us, and each of us, hereto, and which real estatè is of the approximate value of sixteen thousand .dollars."

It will be seen that the only capital of the company was the interest of the incorporators in the "stock in trade, goods, wares and merchandise on hand" belonging to a concern the time limit of which had expired, valued at approximately $9,500; and also of the real estate of the approximate value of $16,000, as stated in this article, and that the company assumed the liabilities of the Co-operative Institution. It will also be observed that the entire value of the assets which went to make up the capital stock of the company was stated to be of the approximate value of $25,500, but there is nothing to show the amount of the liabilities assumed by the company. It is fair to assume that the Co-operative Institution had been in business for a considerable length of time, and was indebted in a considerable amount, and that much of the merchandise was stale and unsalable. Keeping these matters in mind, we turn to the minutes of the meetings referred to, and find that on March 25, 1911, a directors' meeting was held, the minutes of which meeting are as follows:

"March 25/11. Board meeting held in regular place of business. Thos. B. Jones, A. B. Rockhill, Marinus Larson, Ben Argyle, Henry Gardner, A. Tuttle, Ed. Llewellyn present.

"The first question was that of the overdraft at the bank, and the question of raising money to do business with. Superintendent P. P. Thomas read a list of parties owing the store. After commenting on the same for some time the meeting adjourned."

From this it is apparent that in less than sixteen months after the company was incorporated it was financially embarrassed.

The minutes of a director's meeting held July 15, 1911, contain the following:

"The question was that of more money to do business with until fall collections came in. A. B. Rockhill moved, Ben Argyle seconded, we go to bank and try to arrance for what money is necessary to use. Motion carried."

April 15, 1912, less than four months after the transaction between Rockhill and appellant occurred, another meeting of the directors was held, the minutes of which read as follows:

"Special board meeting held in regular place of business. Ben Argyle, W. O. Creer, A. B. Rockhill, John Youd, Marinus Larson, A. Tuttle, present. Ben Argyle presiding.

"The question of money was discussed, and Marinus Larson moved, A. B. Rockhill seconded, that A. B. Rockhill, W. O. Creer and Wm. B. Hughes be a committee appointed to borrow from $7,000.00 to $10,000.00 at any place they may choose. Motion carried.

"The superintendent was instructed to make collections as fast as possible. Motion to adjourn carried."

On October 14, 1912, at a meeting of the directors the following communication from the Commercial Bank, of which Rockhill was an officer, was laid before the board:

"Spanish Fork, Utah, October 9, 1912.

"To the President and Board of Directors, Young Men's Company.

"Gentlemen: I am directed by the board of directors of the Commercial Bank of Spanish Fork to ask that you reduce your overdraft with this bank not less than $5,000.00 on or before ten days from this date. Further, that we will not honor checks drawn on this bank unless this requirement is met as stated.

"Very respectfully,

"R. T. Thurber, Cashier."

The minutes of that meeting contain the following:

"Motion by W. B. Hughes, seconded by W. O. Creer, that the president and secretary hereby are authorized to borrow $15,000.00 at rate of interest not more than eight per cent. per annum, to pay the Commercial Bank what the company owes them, and to execute a first mortgage on the real estate and buildings belonging to the company as security for such loan; also to pledge as security 2,500 shares or such part as may be necessary as collateral to secure the above amount. Motion carried.

"Motion by W. O. Creer and seconded that one of the lady clerks be dispensed with. Motion carried, and the superintendent was instructed to attend to it."

Rockhill was present and participated in all the meetings except the last, when it appears he had "abandoned the ship," for it appears that he attended none of the meetings held after June 8, 1912.

The record discloses that on May 6, 1913, the company, finding that it was unable to meet the demands of its creditors and especially of the Commercial Bank, of which Rockhill was an officer, made an assignment for the benefit of all its creditors. Concerning this assignment appellant testified as follows:

"Mr. Hansen, attorney for the plaintiff, has brought out that I voted on a particular date for the assignment. The directors held more than one meeting in relation to the assignment. Taylor Thurber, cashier of the Commercial Bank, was present at the meetings of the board as creditor and making demands of the company. Mr. Rockhill was present at the time and he was vice president of the company—the same Mr. Rockhill that is deceased. Mr. Thurber told us he wanted the account secured by a mortgage on the real property of the institution, or they would have to enter suit. The board of directors decided not to give the mortgage and to make an assignment so that all creditors would be treated alike. I remember seeing the demand pasted in the book which has been read here, the minutes of the company, dated in October, 1912.

"I voted for the assignment. I voted for it so as to protect all of the creditors of the institution and give them all the same chance."

The record shows that nothing unusual occurred between the time appellant became interested in the company and the time the assignment was made, so that there were no unusual losses; that Tuttle, an employé of the Commercial Bank, was made assignee, and that the business was closed out by him under the supervision of three persons, one represent-

ing the company, one the bank, and one the Utah Association of Credit Men. The bank was represented by its cashier, Thurber.

A statement of the assets and liabilities as shown by the books, as we understand, made January 25, 1913, shows that both assets and liabilities had been reduced approximately $3,600, and that the merchandise on hand was listed at $27,681.41, from which there was realized only about $12,000; that the notes, accounts, and judgments were listed at $12,015, from which there was realized a little over $4,000, while the real estate represented to be of the value of $20,000 was sold after two years of effort for only $5,000 and passed into the hands of the bank. Approximately $4,100 of the accounts, together with $3,850 in accounts which had been charged off as worthless, were sold for only $600.

As all the assets of the company were disposed of by the assignee, who was an employé of the bank, under the supervision of three persons representing the stockholders and all the creditors, it is fair to presume that the amount realized was at least approximately their fair value, and yet only between $21,000 and $22,000 was realized, and creditors received from fifty-eight to sixty per cent. of the amount due them, leaving nothing for the stockholders. There is nothing in the record to show, indeed there was no attempt to show, that the company had sustained any material losses between January 23, 1912, and the date of the assignment. On the contrary, the evidence shows that after appellant became a director he endeavored to economize as much as possible, and yet on May 6, 1913, when the assignment was made, the company was hopelessly insolvent. Can there be any doubt that it was insolvent in January, 1912? We think not. A very careful examination of the record convinces us, not only that the company was insolvent in January, 1912, and that the real value of the assets of the company was less than one-half what Rockhill represented and warranted it to be, but that Rockhill knew these facts, and deliberately misrepresented the facts to appellant for the purpose of inducing appellant to buy this stock, knowing that

the bank of which he was an officer was intending to obtain, if possible, a mortgage on the real estate of the company. And to the writer it is apparent that when Rockhill had succeeded in "unloading" his worthless stock onto appellant he and his associates in the bank set about to compel the company to secure its indebtedness to the bank, knowing that such a course would drive the company into bankruptcy and leave little for other creditors and nothing for the stockholders. The record shows that, notwithstanding the note and certificate of stock were left in the bank to be held until the note was paid, or until the maturity of the note, Rockhill was permitted to withdraw the note long before its maturity. Mr. Hansen, attorney for respondents, testified that Rockhill brought the note to him in February, 1913. It was not due until November 27, 1913. He further testified that after the commencement of this action he wrote to Ben Johnson, an attorney of Salt Lake City, for the papers, and that the escrow envelope came with them. The papers referred to must have been the stock certificate, so that it appears that Rockhill was permitted to take, or as an officer of the bank took, the papers from the bank before the maturity of the note, contrary to the escrow agreement, so that he never parted with anything and appellant never received anything of value. The writer, after having examined the record on this appeal with much care, is convinced that in this mercantile venture the experience of appellant was not very unlike that of the traveler on his way from Jerusalem to Jerico, except that he met with no personal violence. Luke x, 30.

The twentieth finding of the trial court is as follows:

"The court finds all of the issues raised by the pleadings in this action in favor of the plaintiffs and against the defendant, except as hereinbefore mentioned."

The exceptions mentioned were those as to discrepancies in the value of merchandise, amounting to $121.40, and as to liabilities, which the court found were $196.70 greater than represented in the statement of assets and liabilities, but which respondents concede were $996.70 greater than so

represented. If by this twentieth finding is meant that the court finds that the company was solvent in 1912, it is not only not supported by sufficient evidence, but is contrary to the overwhelming weight of the evidence. We do not think, however, that the trial court by any of its findings meant to be understood as finding that the company was solvent in January, 1912; and yet, as we have pointed out, the real issue in the case was this question of solvency. Both in the oral argument and in his brief counsel for respondents proceeds on the theory that the question to be determined was and is the correctness of the statement of assets and liabilities of the company as shown by the books of the company. In his brief counsel for respondents suggests that the findings of the trial court were not a mere guess, as the court, he says, had ample time to audit the books. Auditing the books might show whether or not the statement of assets and liabilities was correct as shown by the books, but would not show whether or not the values carried on the books were the true values of the property. Both counsel for respondents and the trial court appear to have lost sight of the real issue, viz., the solvency or insolvency of the company in January, 1912, when Rockhill represented it to be solvent. We cannot conceive of any process of reasoning by which any one, after a careful examination of this record, can arrive at any other conclusion than that the company was hopelessly insolvent in January, 1912, and that this fact was known to Rockhill and that for that reason he was anxious to sell his stock.

There was no attempt on the part of the respondents to explain the more than sixty per cent. apparent decrease in the value of the assets of the company in the short time that elapsed between January, 1912, and the sale under the assignment; nor was there any effort made to prove the actual value of any of the assets except the real estate, and the testimony of the witness called by respondents on this subject was so shuffling, evasive, and unreasonable as to be worthy of little consideration. After two years of effort this real estate sold for only one-fourth of the value

placed on it by Rockhill. A recognized method of determining market value is to prove that the property was offered for sale, and the sum sold for after reasonable efforts to secure the highest price obtainable. Mechem on Sales, 1692.

It is urged by respondents that by taking an active part as director in the management of the business of the company, by accepting $375 dividends on' the stock, and, finally, by insisting on an assignment for the benefit of all its creditors, the appellant is estopped from making the defenses pleaded. But how can it be said that Rockhill was prejudiced by any of these acts of appellant? So far as appellant's actions in the management of the business is concerned, the record shows that he was at all times endeavoring by economy to save the company from bankruptcy. His insistence upon an assignment for the benefit of all the creditors, instead of preferring the bank by giving to it a mortgage, instead of working an estoppel, was highly commendable. As to the return of the $375 which appellant had received as dividends on the stock, it must be remembered that he paid Rockhill $1,250 in cash at the time of giving the note, and later paid $131.25 on the note; so that Rockhill had received $1,006.25 more than he would have received had he not sold the stock. Had there been a rescission, to place the parties in statu quo would have required the return of this sum by Rockhill to appellant. Let it be remembered that this $375 and the task of trying to pilot an insolvent corporation off the shoals of bankruptcy are all appellant ever received for the $1,381.25 paid by him to Rockhill. True, the stock had been transferred to appellant on the books and a certificate made out to him, but he had been required to indorse this certificate to Rockhill, and apparently Rockhill took it from the bank and held possession of it to the time of his death. In trying to collect the note sued on respondents are attempting to reap where their intestate had not sown.

It will not do to say that because appellant did not rescind the contract he may not defend this action on the grounds pleaded. Rescission was not, as counsel for

respondents seems to suppose, his only remedy. The rule is well stated in Mechem on Sales, section 1839, thus:

"The buyer who has been imposed upon or misled by the fraud of the seller has usually his choice of a variety of remedies. For example: (1) He may, rescind the contract, restore what he has received, and recover what he has parted with. (2) He may retain the property and bring an action for damages for the deceit. (3) He may retain the property, and in an action by the seller for the price may be allowed damages for the injury caused by the deceit.

"The mere fact, moreover, that the buyer has resold the goods to another does not preclude a recovery of damages for breach of the warranty of quality."

In his answer the defendant sets up a counterclaim, by which he seeks to recover the $1,250 paid in cash on the stock at the time of the purchase, and the $131.25 interest paid on the note in question, less $375 dividends on stock received by him. Section 6576, Comp. Laws Utah 1917, defines a counterclaim to be "one existing in favor of a defendant and against a plaintiff, between whom a several judgment might be had in the action," etc. Section 7645 requires an administrator to give notice to creditors of the time for the presentation of claims against the estate. Section 7648 provides that all claims must be presented within the time limited in the notice mentioned in section 7645, and that any claim not so presented is barred. Section 7653 provides that when a claim is rejected suit must be brought within three months after the date of its rejection.

Since no claim was ever presented against the estate to the respondents, no action by way of counterclaim can be maintained. It follows that the judgment of the trial court should be vacated; and inasmuch as there is no substantial conflict in the evidence, the action and also the counterclaim should be dismissed, and it is so ordered. Appellant to recover costs.

CORFMAN, C. J., and FRICK and WEBER, JJ., concur.

GIDEON, J., concurs in the result.

THURMAN, J., being disqualified, did not participate herein.