## GUARANTY MORTGAGE CO. v. ELLISON.

No. 4209. Decided July 20, 1925. Rehearing denied September 8, 1925. (239 P. 29.)

1. CORPORATIONS—REPRESENTATIONS, CONCERNING CORPORATION IN WHICH DEFENDANT WAS INDUCED TO BUY STOCK, HELD REPRESENTATIONS OF FACT. In action on note given for stock in corporation, defended on ground of false representations in sale of stock, representations that corporation in question had reserve on hand, and that it was organized under state banking laws, were representations of fact whose effect was to induce purchase of stock, and defendant was not bound to make independent inquiry or investigation to ascertain truth thereof.

2. CORPORATIONS—REPRESENTATION THAT CORPORATION IN WHICH STOCK WAS SOLD WAS SUBJECT TO INSPECTION BY BANK EXAMINER, HELD ONE OF LAW, BUT HAVING TENDENCY TO MISLEAD WHEN CONSIDERED WITH ANOTHER REPRESENTATION. In action on note given to pay for stock in corporation, defended on ground of false representations in sale of stock, representation that corporation in question was subject to inspection by bank examiner, while one of law, coupled with representation of fact that it was organized under state banking laws had tendency to mislead, and defendant relying thereon in purchasing

1

stock was not bound to make independent investigation to determine truth thereof.[1]

3. CORPORATIONS—EVIDENCE HELD INSUFFICIENT TO SUPPORT FINDINGS FOR PLAINTIFF SUING ON NOTE GIVEN FOR CORPORATION STOCK. In action on note given to pay for stock in corporation, evidence that defendant in purchasing stock was misled by misrepresentations that corporation in question had large reserve on hand, that it was subject to inspection by state bank examiner, and that it was organized under banking laws, *held* insufficient to support findings that defendant was not induced to subscribe for stock or execute note by fraudulent representations, and other findings in favor of plaintiffs.

4. CONTRACTS—ENFORCEMENT OF CONTRACT PROCURED BY FRAUD WILL BE REFUSED. Although court has duty to uphold integrity of solemn contracts and to enforce them, enforcement of contract procured by fraud will be refused.

5. APPEAL AND ERROR—DEFENDANT AGAINST WHOM JUDGMENT ON NOTE FOR STOCK IN CORPORATION WAS RECOVERED, HELD ENTITLED TO NEW TRIAL. Where judgment was recovered against defendant on note for stock in corporation, although such stock was purchased on account of fraudulent misrepresentations where corporation suing on note held stock certificate as security therefor, and defendant had received nothing in equity which she should be required to restore, granting defendant new trial is proper.

6. EVIDENCE—TESTIMONY OF REPRESENTATIONS BY PLAINTIFF'S AGENTS OTHER THAN THOSE WHO MADE REPRESENTATIONS TO DEFENDANT AND LONG PRIOR THERETO HELD INADMISSIBLE. In action on note given for corporation stock, defended on ground of fraudulent misrepresentations inducing purchase of stock, testimony, as to representations by plaintiff's agents other than those who made representations to defendant, and long prior to transaction complained of, was immaterial and inadmissible.

---

[1] *Ogden Valley Trout & Resort Co.* v. *Lewis*, 41 Utah, 188, 125 P. 687; *Rockhill* v. *Creer*, 56 Utah, 119, 189 P. 668.

Headnote 1.   14 C. J. pp. 606, 607 (Anno.).
Headnote 2.   14 C. J. pp. 610, 613 (Anno.).
Headnote 3.   14 C. J. p. 603.
Headnote 4.   13 C. J. p. 394.
Headnote 5.   4 C. J. p. 1197.
Headnote 6.   22 C. J. p. 748.
Headnote 7.   40 Cyc. p. 2418.

7.  WITNESSES—EXCLUSION OF ANSWER TO QUESTION AS TO PROPERTY
    OF CORPORATION AT TIME OF ITS ORGANIZATION, TO SHOW WHETHER
    IT HAD RESERVED AS REPRESENTED TO PURCHASER OF STOCK, HELD
    ERROR.  In action on note given for stock in corporation, de-
    fended on ground of fraudulent misrepresentations, excluding
    answer to question as to what property corporation acquired
    at time of its organization, asked at beginning of examina-
    tion into general affairs of corporation and bearing on question
    of reserve, which corporation was represented to have, was
    error.

Appeal from District Court, Second District, Weber Coun-
ty; *George S. Barker*, Judge.

Action by the Guaranty Mortgage Company against Har-
riet E. Ellison.  Judgment for plaintiff, and defendant ap-
peals.

REVERSED AND REMANDED, with directions.

*J. D. Skeen*, of Salt Lake City, and *W. H. Streeper*, of
Centerville, for appellant.

*Pratt & Pratt*, of Ogden, for respondent.

THURMAN, J.

This is an action on a promissory note for $1,000, payable
in annual installments of $200 each, the first installment pay-
able December 12, 1921.

It is alleged in the complaint that the note was executed
as payment upon a subscription contract for 10 shares of the
preferred capital stock of plaintiff company; that the stock
was issued and delivered to defendant and deposited by her
with plaintiff as security for the payment of the note; that
said note had not been paid, nor any part thereof, and plain-
tiff declared the entire principal due, with interest thereon,
as provided in the note.  Defendant answered and counter-
claimed alleging fraud in the procuring of the subscription
contract and note, with prayer for rescission and cancellation.

The specific grounds relied on by defendant for rescission and cancellation are that plaintiff falsely represented to defendant that plaintiff was organized under and subject to the banking laws of the state of Utah; that it was subject to regular examination by the state bank examiner; that the money invested by subscribers had been loaned on first mortgages on residence and business property at not to exceed 50 per cent. of a conservative appraised value; that all money paid by defendant would be likewise invested; that the business had been conducted on a conservative basis, was honestly managed, and that the preferred stock was of value more than $100 per share; that a dividend of 7 per cent. was guaranteed, and that the company had a surplus out of which dividends would be paid. Defendant further alleged that she relied upon the aforesaid representations; that each and every one of them was false, and known by plaintiff to be false when made; that defendant was not informed of their falsity until about November, 1922, and that she would not have subscribed for said stock and executed the note, if she had known that said representations were false. Defendant's answer contains many' other allegations tending to show a plan or scheme on the part of plaintiff to obtain subscriptions to its capital stock by means of similar false and fraudulent representations. It is unnecessary to state in detail all of such allegations.

Plaintiff, in its reply, admitted it was not organized under the banking laws of the state, and that some of its loans were made on second mortgages. It denied having made any false or fraudulent representations to defendant, or that plaintiff made such representations knowing them to be false, or that defendant relied thereon.

The court, to whom the case was tried without a jury, found every material issue in favor of the plaintiff and entered judgment thereon against the defendant for $1,247.50, together with $100, as attorney's fee, and costs to be taxed. Defendant appeals.

Many errors are assigned relating to the findings of the court and to the admission and exclusion of evidence. The

findings most vigorously challenged are to the effect that defendant was not induced to subscribe for the stock or execute the note by false and fraudulent representations, but that she signed said instruments with full.knowledge of their character and of the liability she was assuming. The court also found that defendant relied on the fact that other members of her family had subscribed for stock of a similar character in the plaintiff company, and she believed she would receive in dividends more for her money by investing in said stock than she would by investing a similar amount with a banking institution. Appellant contends that these findings, and many others of similar import, are not supported by the evidence.

The testimony of the defendant, as to how she came to subscribe for the stock, is substantially as follows: She resides at Layton. Her husband has been dead for 20 years. On April 14, 1921, she was at home cooking dinner when two men called upon her respecting the Guaranty Mortgage Company. She conversed with them after dinner. Her son, Glen, who is now dead, was there, but did not participate in the conversation. He had bought some of the stock some time before. The men told her they were representing the Guaranty Mortgage Company; that the company was organized by astute business men under the state banking laws, subject to state bank inspection; that it was better to put her money in the Guaranty Mortgage Company than in the bank. She asked them why, and they said because it would bring more interest; that the banks would allow only 4 per cent. and the Guaranty Mortgage Company would allow her 7. She told them that she was not in a position to take the stock and did not want to take it. She asked them why they came to the farmers, and told them if it was a good thing there were plenty of wealthy business men that would take what they had. They said they were going to sell to the farmers; that they were taking first mortgages on real estate; that by that means they obtained an income capable of taking care of their property, and also that they had a reserve that even if they did not make it that way,

they had enough to pay the interest on their money or the dividends on the stock. They also told her if she waited she would not get a chance, because there was such a demand for the stock. They told her if she would subscribe they would fix up a 10-year contract that would make it easy for her. She stated, categorically, that she believed each of the above representations as to the manner of the company's organization, the character of security upon which they loaned its money, and the fact that it had a reserve out of which dividends could be paid, and that if she had known any of said representations were false she would not have subscribed for the stock.

On cross-examination she testified she had some stock in sugar companies, some of which came through her husband, also some mill stock, and had had a bank savings account which drew 4 per cent. interest; that she purchased the stock in the Guaranty Mortgage Company because it would pay better interest than a bank; that she knew it was not a bank, but thought it was better. She reiterated her testimony in chief as to the representations made concerning the organization of the plaintiff company, character of securities upon which it loaned its money, and reserve on hand for the payment of dividends. On being asked why she would not have subscribed for the stock if she had known the company had not been organized under the banking laws, she answered "because it would not have been as good—it would not have been as sure." She thought they were telling the truth. She got the understanding they had money enough to pay dividends for a while, even if they did not earn any in the business. She said she did not converse with her sons about taking stock. She knew they had taken some before and had received some dividends. When asked if she was not influenced by the fact that her sons had already taken some stock she first answered "yes," and then said "I don't think it did." She said her son Glen subscribed for some stock in 1918; that she had nothing to do with it, and did not advise him to take it. She knew that the company in 1918 was engaged in selling real estate, but did not know they were in

the insurance business. She said she first learned of the
fraud when a case was decided by the Supreme Court. She
had sent one of her sons to try to compromise the matter to
avoid a lawsuit. When they called on her for payment of
the interest she told them how she had been deceived by the
agent that procured the subscription. She never received a
dividend and did not know of any having been placed to
her credit. She was engaged in the farming business and
had never been a director in any company.

Parley M. Ellison, son of defendant, testified, in substance:
Live in Layton. Knew Collins and Denson. Met them about
April 14, 1921, at his mother's home in Layton. He was in
the field when they came. Had a conversation with them.
No one else was present. They told witness the plaintiff com-
pany was organized by very shrewd business men of Ogden.
They assured him it was much better to invest money in than
a bank because of an assured dividend of 7 per cent. whereas
a bank gave only 4, and they claimed the dividend was as-
sured by a reserve fund they had to complete payment of the
dividend in case of a shortage in the earnings. They also
told him that the company was organized under the state
banking laws of Utah, subject to inspection by a state bank
examiner at regular intervals, and that they were investing
their money in first mortgages on real estate. No prospectus
was exhibited to witness. He did not know at that time that
his mother had subscribed. He subscribed for 20 shares. It
appears from memorandum exhibited to witness that this
conversation was on April 21, 1921. This was his first sub-
scription for stock. He had no previous knowledge of the
character of plaintiff's business. He had heard of the com-
pany. He understood they had a saving's business in con-
nection with their other business, but never thoroughly un-
derstood it. Witness was sure they said the company "had
a reserve," not that it "would have it."

The testimony of this witness was admitted over plaintiff's
objection, as tending to prove a plan or scheme to defraud.
Plaintiff admitted in its reply to defendant's counter-claim
for rescission that it was not organized under the banking

laws of Utah, and also that all of its money was not loaned on first mortgages on real estate.

The evidence shows that 65 or 70 per cent. of its funds were loaned on or invested in second mortgages and real estate contracts. It had no reserve at the time of the transaction with the defendant, and, as I read the record, its capital stock was impaired to the extent of several thousand dollars. It never paid a dividend to defendant nor placed one to her credit, notwithstanding there is a veiled suggestion, by questions on cross-examination, that she received credit for at least one dividend. The amount sued for and the judgment entered is conclusive evidence of the fact that no dividend was placed to her credit. The agents who made the alleged representations to the defendant and procured her subscription for the stock were not called as witnesses; nor is there any dispute concerning their agency for the company.

J. H. Andrus, president of plaintiff company, testified he first met defendant in December, 1918, at her home in Layton. He conversed with her and her son Glen about the plaintiff's business. Glen subscribed for $500 worth of stock. The company was just starting in business and was making a canvass for subscribers. Defendant did not subscribe but said Glen could do as he pleased. The company was not selling savings certificates at that time. Nothing was said about banking or having a surplus to pay dividends. They did not have anything then; they were just in the organization stage. At that time they had no idea of increasing their capital. The articles were amended April 10, 1920. The capital stock was increased from $85,000 to $500,000; $100,000 common stock and $400,000 preferred. A prospectus was issued stating:

"The preferred stock is a first lien against the assets of the company. State laws provide inspection. This company is under the state banking supervision and its financial condition is subject to regular examination by the banking department of the state, and must also have a permit from the state securities commission to issue and market the stock, bonds, and securities."

The prospectus also stated:

"In this department the funds of the company are loaned on first mortgages on residence or business property at not to exceed 50 per cent. of a conservative appraised value thereof."

The company commenced selling savings certificates in 1920 and sold for about a year, until the banking department objected. Selling agents were authorized to represent that they were under banking supervision and continued until the banking department directed them to not sell any more savings certificates. This was early in 1921. The company did not issue the prospectus in 1921, but did not call in those that had been issued before. Collins and Denson were selling agents, and were told at first that the company was subject to the supervision of the bank examiner. Witness knew that Collins and Denson were representing that the company's affairs were regularly examined by the banking department.

The foregoing is a brief synopsis of the main features of the evidence.

The authorized business of the plaintiff company is stated in the following finding of the court:

"To buy and sell personal property and real estate of all kinds; to buy and sell, discount, and hypothecate stocks, bonds, promissory notes, mortgages, choses in action, and evidences of debt; to contract for, erect, furnish, and rent buildings, make loans and investments, act as commission brokers, and carry on the loan business in all its departments, as well as to do a general real estate business.

"To conduct and carry on a general fire, life, employers' or industrial and accident insurance agency in all its departments; to purchase, lease, use, and hold all real and personal property which may be deemed necessary or convenient to enable the corporation to collect its debts, judgments, or decrees in its favor, or to act for and in behalf of others as agent, trustee, or assignee, and to sell or otherwise dispose of any or all such property as it may deem expedient.

"To borrow money and use its notes, bonds, or other securities therefor, either secured on real or personal property or unsecured; to hypothecate loans made upon real estate for itself or others; to issue bonds in lieu of mortgages on real estate and guarantee same; to execute trust deed or deeds and guarantee the same with

the property of the corporation and do any or all other things necessary or incidental in connection with any or all of the foregoing pursuits or departments of business, and do any and all other things and acts not expressly set out, but which are incidental to the pursuits or the objects herein enumerated."

There is no substantial conflict in the evidence as to the representations made to the defendant by the agents of the plaintiff. They represented that the plaintiff was organized under the banking laws of the state, and was subject to examination by the bank examiner. They represented that the money of the company was loaned on first mortgages on real estate. They represented that plaintiff had a reserve fund out of which dividends would be paid when there was a shortage of earnings.

When defendant was first approached by the agents in December, 1918, she did not invest. At that time there were no such representations made as were afterwards made by Collins and Denson. The seductive features held out by them had not been added to the business. In April, 1920, the articles were amended, the capital stock vastly increased, the prospectus issued, the protection of state laws assured, the claim of bank supervision promulgated, and to show the exceptionally good financial standing of the company it was represented that there was a reserve fund or surplus out of which dividends could be paid if there was a shortage in earnings.

It may be, as suggested by the trial court during the trial of the case, that the representation of a reserve was so preposterous that no one should be misled thereby. The writer is not as sure of that as was the honorable trial court. It is probable that the representation that dividends would be paid out of a reserve fund was predictive merely, and not a representation of fact constituting fraud; but the representation that there was a reserve on hand was unquestionably a representation of fact, and one which might have a tendency to allure because it at least implied a sound, stable, financial condition, with substantial assets in excess of        1, 2
liabilities and capital unimpaired. It was a repre-

sentation of fact and well calculated to deceive. The representation that the plaintiff was organized under the banking laws of the state was a representation of fact. The representation that it was subject to inspection by the bank examiner, standing alone, was a representation of law, but coupled with the representation that it was organized under the banking laws it had a tendency to mislead. It is true the defendant testified she knew it was not a bank. She thought it was better because it paid more interest, and, being organized under the banking laws and subject to inspection by the banking department, gave assurance of conservative methods in the management of the business.

While it is not material in an action in equity for rescission that the party alleging fraud should prove that his adversary knew that the representations were untrue, it is a fact, nevertheless, that at the very time Collins and Denson were making these representations they knew, or should have been informed by the company, that the banking department had ordered the plaintiff to cease the sale of savings certificates and abandon that feature of the business—the only feature that could possibly confer the duty of inspection upon the bank examiner. As regards the representation that the money of the company was being loaned upon first mortgages, the implication of fraud is not so clear. The plaintiff did lend some of its money on first mortgages, and, therefore, what it said was literally true. Notwithstanding that, it no doubt had some tendency to deceive because it was susceptible of the inference that all of its money was loaned upon first mortgages, which, clearly, was not the case.

The facts of this case bring it within the principle of *Ogden Valley Trout & Resort Co.* v. *Lewis,* 41 Utah, 188, 125 P. 687. The form of action in that case was identical with the form of action in the case at bar, and in the facts and legal principles involved the cases are analogous in many respects. The appellant therein, as assignee of a promissory note, sued to recover judgment thereon. Defendant answered alleging fraud by which respondent was induced to execute the note. The note was given for the purchase price

of shares of stock in a corporation. Respondent alleged that the payee of the note falsely represented that the stock was treasury stock and that the proceeds of the sale would be used in promoting the business of the company. Other representations were made, not necessary to enumerate here. The representation as to the character of the stock was untrue. It was not treasury stock as represented, but stock belonging to the payee of the note: The judgment of the trial court, rescinding the contract upon which the note was founded, was affirmed. Many cases are cited in the opinion which, together with the opinion itself, are in point upon the question involved in the instant case. There is a distinction between that case and this, in that in that case the judgment of the trial court was affirmed, while in the instant case it should be reversed, because there is no substantial evidence to support the findings. See, also, *Rockhill* v. *Creer*, 56 Utah, 119, 189 P. 668; 2 Fletcher, Ency. Corp. § 625; *Martin* v. *Hutton*, 90 Neb. 34, 132 N. W. 727, 36 L. R. A. (N. S.) 602; *Halsell* v. *Bank*, 48 Okl. 535, 150 P. 489, L. R. A. 1916B, 697; *Hicks* v. *Stevens*, 121 Ill. 186, 11 N. E. 241; *Loverin* v. *Kuhne*, 94 Conn. 219, 108 A. 554, 33 A. L. R. 848, and note.

The note to the last case cited is extensive and illuminating upon nearly every question relating to fraudulent representations. The doctrine announced in the cases cited is not controverted by the respondent. As reflecting the rule, I quote at length an excerpt from Fletcher, supra:

"As a general rule, if a positive representation as to a material fact is made to a person to induce him to subscribe for stock in a corporation, with the intention that he shall rely upon it, and the fact is one as to which the person making the representation can be supposed to have knowledge, the subscriber has a right to rely upon the same, and is not bound to make independent inquiry or investigation to ascertain for himself whether it is true or false; and if a subscription, therefore, is in fact induced by a false and fraudulent representation of fact, the subscriber's right to rescind cannot be resisted by the corporation on the mere ground that he was negligent in relying upon the representation, and that he could have ascertained the truth if he had made inquiry or investigation. Under such circumstances, he is not bound to go to the public rec-

ords or other sources of information to verify the truth of the representations, and of course a failure to examine the public records will not preclude a rescission where such investigation would have disclosed the truth.

"In a leading English case it was said: 'When once it is established that there has been any fraudulent misrepresentation or willful concealment by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by proper inquiry. He has a right to retort upon his objector, "You, at least, who have stated what is untrue, or have concealed the truth, for the purpose of drawing me into a contract, cannot accuse me of want of caution because I relied implicitly upon your fairness and honesty."' And in a New York case it was said: 'Every contracting party has an absolute right to rely on the express statement of an existing fact, the truth of which is known to the opposite party, and unknown to him, as the basis of a mutual engagement; and he is under no obligation to investigate and verify statements, to the truth of which the other party to the contract with full means of knowledge, has deliberately pledged his faith.'"

I am of the opinion that the representations made by plaintiff to defendant were representations of fact; that they were calculated to induce her to contract for the purchase of the stock; that she relied upon the representations and believed them to be true, but that they were in fact false; that she would not have contracted to purchase the stock if she had known the representations were false. Consequently, I am of opinion that the case comes clearly within the doctrine of the cases above cited, as to which there is apparently little or no substantial conflict among the authorities. It follows, therefore, that under the evidence appearing in the record plaintiff is not entitled to recover.

It is our bounden duty to uphold the integrity of solemn contracts and enforce the obligations resulting therefrom; but it is equally our duty to refuse the enforcement of a contract when procured by fraud. No injustice can be done in this case by granting the defendant a new trial. The plaintiff is in possession of the certificate of stock holding it as security for the note. The defendant has received nothing which in equity she should be required to restore. Were it not for the fact that it appears upon the face of the proceed-

ing that there may be other evidence that would justify the court in arriving at a different conclusion respecting the merits of the case than that above stated, we would **4, 5** deem it our duty to grant to defendant the relief prayed for in her counterclaim and order a rescission and cancellation of the note. Besides this, we are of opinion that the trial court adopted an erroneous theory in its finding and conclusions in respect to what constitutes a material representation of fact in an action based upon fraud. For these reasons, justice to both parties requires that the case be remanded for a new trial.

The remaining errors assigned relate to the exclusion of evidence offered by the defendant. We are of opinion that the testimony of witnesses as to representations made by agents of plaintiff, other than those who made the representations to the defendant, and at times long anterior to the transaction complained of by defendant, was immaterial and therefore inadmissible. The court did not err in sustaining plaintiff's objection thereto. But we are in- **6, 7** clined to the view that the coure erred in sustaining plaintiff's objection to the following question propounded by the defendant to the witness Andrews: "Mr. Andrews, at the time of the organization of the company—Guaranty Mortgage Company—what property did it acquire?" At the time the objection was made, defendant's counsel explained the purpose of the question. It went to the question as to whether plaintiff had a reserve or could have a reserve, and, as further explained by counsel, "it is the beginning of an examination into the general affairs of the corporation." While the court of course could exercise a discretion as to the extent to which it would permit such an examination to proceed, we are of opinion the question was proper, and that the objection thereto should have been overruled.

For the reasons stated, the judgment is reversed, and the cause remanded, with directions to the trial court to grant the defendant a new trial at respondent's cost.

GIDEON, C. J., and CHERRY, FRICK, and STRAUP, JJ., concur.