## SKOLA v. MERRILL et al.

No. 5628.  Decided January 4, 1937.  (64 P. [2d] 185.)
Rehearing Denied June 1, 1937.

*H. A. Smith, Gaylen S. Young,* and *Bowen & Quinney,* all of Salt Lake City, for appellants.

*Richards & Mitchell* of Salt Lake City, for respondent.

FOLLAND, Justice. ·

The outline of the case is stated in the dissenting opinion of Mr. Justice EPHRAIM HANSON.

This is an equity case where the parties are entitled to have our judgment on the weight of the evidence in the record presented. I have carefully read the entire transcript and am satisfied the fair preponderance of the evidence is against the findings of fact in the main particulars on which the decision turns. The dissenting opinion, holding as it does for plaintiff, naturally leans heavily on the evidence adduced in Skola's behalf. The story told by the Skolas is so utterly fantastic and improbable that I feel we ought not to believe it unless it finds support and corroboration in material respects by other witnesses, documentary evidence and known facts. When tested or measured by the standards of proof required in such cases and weighed against the testimony of disinterested witnesses and documentary evidence, it does not meet the test. In most important particulars the testimony of the Skolas on the one hand that of the Merrills on the other is in sharp conflict. These parties are all interested. There were disinterested witnesses called such as Mr. McEwan, assistant

cashier of the Zion's Savings Bank & Trust Company, Mr. D. B. Richards who acted as attorney for Mrs. Skola, and Mr. Hugh B. Brown who at that time was attorney for the Deseret Mortuary Company and Merrill Mortuaries, Inc. The evidence given by these men is reasonable and consistent with what one would expect under the circumstances, but each is in sharp conflict on material points with the testimony of Mr. and Mrs. Skola. I desire merely to refer to particulars of the evidence which sustain my view that the findings in many vital particulars are not supported.

Some of the facts to be kept in mind as a background for a consideration of the testimony are these: In about the year 1925, Charles S. Merrill introduced a new idea in the undertaking business. He organized the Deseret Mortuary Company to carry on a mortuary business and undertook to sell burial certificates which obligated the company to supply all services and materials in connection with the care of the body and its interment at the cost thereof plus 10 per cent. The plan seemed to be popular and by the fall of 1929 there were five or six thousand burial certificates already outstanding. The company was doing a thriving business. Its business was so large that it incurred the enmity and opposition of practically all of the competing undertakers in the districts where it did business. Approximately $100,000 had been paid by the purchasers of these burial certificates and the assets of the Deseret Mortuary Company had increased from $12,000 to about $250,000. In September, 1929, at the time the transaction in question in this case was consummated by the sale of stock in Merrill Mortuaries, Inc., to John Skola and Vesta Skola, his wife, the Deseret Mortuary Company had outstanding 17,800 shares of stock, practically all of which had been owned by Charles S. Merrill and which at the time of the incorporation of Merrill Mortuaries, Inc., had been transferred to that company. According to an audit by Scholefield, Wells & Baxter, certified public accountants, the net worth of the Deseret Mortuary Company immediately before the organization of Merrill Mortuaries,

Inc., was $249,200. The Merrills had extended their operations into Montana, Oregon, and Idaho. On September 9, 1929, Merrill Mortuaries, Inc., was organized. It was intended to be a holding company for the Deseret Mortuary Company operating in Utah and other Merrill interests in the other states named. On September 14, 1929, the sale to John Skola and Vesta M. Skola was consummated of 12,000 shares of first preferred stock and 3,000 shares of common stock of Merrill Mortuaries, Inc., for a purchase price of $30,000. To rescind this sale, plaintiff brought this suit, charging fraud against the defendants named and tendering a return of stock in the Merrill Mortuaries, Inc. In the meantime the stock originally purchased had been exchanged for another type of stock of the same company thereafter authorized and issued.

I shall not attempt to review the entire record, but only refer to parts of the testimony which seem to me to show that the Skolas are not entitled to prevail in a suit for the rescission of the contract.

The trial court found that plaintiff and his wife had a very limited knowledge or understanding of the English language, written or spoken, and spoke or understood it only disconnectedly and with great difficulty. This supposed lack of understanding of the English language was emphasized throughout the trial and in the briefs of counsel for plaintiff in this court for the purpose of showing that it would be easier for the Merrills to practice deception and fraud upon them than it would be on persons having a better understanding of the language. The finding is probably correct as applied to Mrs. Skola. On the other hand, John Skola had been a resident of Salt Lake City for 23 years. He had conducted a business enterprise from which he accumulated upwards of $30,000. In the course of this business he came in contact with many people, bought machinery, built a factory, purchased a home and transacted nearly all of his business in the English language. He testified that he understood the language and that he spoke it in the home

with his children and with most of the people with whom he had business relations. He said that he and his wife spoke German in the home. He testified that he did not have difficulty in understanding the Merrills when they came to see him. All his conversations with them were in English. All the representations of whatever sort on which this suit was based were made in that language. Both Skola and his wife said they understood and believed what the Merrills said, and on the witness stand attempted to repeat the substance of those conversations. There is no allegation that they were imposed on by any misunderstanding of what was said. When the Merrills requested Skola to turn in the stock originally issued to him and take other stock in the corporation, he was shrewd enough to drive a hard bargain and obtained a $2,000 stock bonus in the trade. In this he obtained more than any of the other stockholders who made the exchange. I think altogether too much stress is laid on the claim that Skola was inexperienced in business and could not understand or use the English language. I think it clear that Skola was a shrewd, capable, and hardworking business man, and that the fact he had accumulated upwards of $30,-000 is a tribute to his ability.

Charles S. Merrill and his brothers had organized and conducted a large business enterprise and were men of such experience that it is very difficult to believe they were crude, stupid, unbusinesslike men, using methods which we can conceive of being used only by immature, inexperienced, amateur salesmen. The fact that the Skolas testified as they did is the strongest evidence in the case of their inexperience in business transactions. That testimony leads one to believe that their story grew out of a very narrow basis of fact and was greatly distorted in the imagination of the narrators.

Skola testified that on or about the 15th of June, 1929, Charles S. Merrill came to him and offered him 20,000 shares of Deseret Mortuary stock for $30,000 and that when he

purchased the stock on September 14th he obtained Merrill Mortuaries, Inc., stock instead of Deseret. This particular alleged deception is not relied on as the basis for rescission. The Merrills flatly deny that any such offer was made at that or any other time. It is undisputed that in June or July of 1929, Merrill Mortuaries, Inc., was not only not in existence, but not even projected. At that time the Deseret Mortuary Company was a prosperous and growing concern. It owned property having a book value of approximately $250,000 with only 17,800 shares of common stock outstanding. There were no other kinds of stock issued or to be issued. The intrinsic value of the stock was about $14 a share. Most of the outstanding stock was owned by Charles S. Merrill. No Deseret Mortuary stock was for sale either by the corporation or by Mr. Merrill. This company had, however, many agents in the field offering for sale and selling its burial certificates which were being purchased by thousands of the subscribers, including officials of the L. D. S. Church, as well as other prominent persons residing in the communities served by the Mortuary Company. John Skola had been solicited to buy these certificates either in May or June of 1929 but had declined to purchase. The Merrill Mortuaries, Inc., was planned during August and incorporated in September, but until September 9th there were no shares of stock of that company actually for sale. John Skola would have us believe that Charles S. Merrill on or about June 15th sought him out at the pigpen in his yard and offered to sell him 20,000 shares of Deseret Mortuary stock for $30,000. If it was his own stock Merill was offering to sell, this would be more than he owned, and by the sale he would have transferred for $30,000 more than his entire ownership in the company. If it was treasury stock he proposed to sell, the sale would convey to Skola a controlling interest in the company for approximately one-tenth of its book value. It is pure nonsense to think that any business man would make such an offer, which, if accepted, would cause him no end of embarrassment.

Mr. Merrill's version of the transaction to the effect that Skola was solicited in May or June to purchase Deseret burial certificates, which he declined, but that he inquired about the purchase of stock and was told there was none for sale, but that later he was solicited to buy stock in the newly organized Merrill Mortuaries, is fairly consistent with known facts. Skola's testimony would seem to be a mixture or confusion of the representations made in the attempt to sell him Deseret certificates with the later solicitation to buy Merrill Mortuaries stock, either ignorantly confused and confounded or done willfully for the purpose of aiding him to recover the money paid for the stock.

Skola's recital of the incidents connected with Charles S. Merrill's first visit and interview with him is too preposterous to have much weight. He said Merrill came to his place and found him in the pigpen, and then said (quoting from the abstract) :

"It was about the 15th or 16th of June, 1929, when Mr. Merrill came to my place. I heard the dog barking and came out of the pen and saw a man coming across the wires by the road. Our road came from the West to our house and he came from the north to the house along the barbed wires. The dog barked so much I came out and he said, 'I am Charles Merrill, the president of the Deseret Mortuary Company. I want to sell you some stock.' My little girl came out and he said, 'Who is that girl?' I said, 'That is my daughter.' He said, 'I do not want to see anybody around here, do not say I was here. Which way is best to get out of here?' I said, 'The same way you came through the barbed wire,' and he said, 'You come behind the hogpen and I will show you how to make lots of money.' We went behind the hogpen and he said, 'I know you belong to the church, and your wife, so I belong to the church and my brothers. Do you know my brothers?' I said, 'No, I don't know them, this is the first time I hear your name.' He said, 'I have three more brothers, too, they will come to see you, too. I want to show you how you can make lots of money." He took a pencil out of his pocket and he said, 'I will sell you stock for one dollar and a half a share for the Deseret Mortuary Company. That would be twenty thousand shares, and I will give you interest on it and I will show you how you can make lots of money.' And he said he had deal on to build a mortuary house for twenty-five thousand dollars, and as soon as it is ready, it would be worth fifty thousand dollars.

He said he would use my money for building the mortuary. The business doubles the money every year. 'The first year you will make sixty thousand dollars. Next year you will make one hundred and twenty-thousand dollars, and so you can make a million dollars out of thirty-thousand dollars. You do not need to be afraid, you cannot lose anything.' He said, 'The church is behind it, we have so many church officials. * * *' "

According to Skola, Merrill visited him again two days later at the pigpen where substantially the same conversation was repeated, and that he and his brothers, Clarence and Tom, visited him at least twice a week throughout the summer and until September 14th when the sale was consummated, notwithstanding it is established by disinterested testimony, as well as the testimony of the Merrills themselves, that they were out of the city most of that time. Mr. Strebel, auditor for the Merrills, refreshing his memory from records, testified that Charles S. Merrill was not in Salt Lake City from the 1st to the 17th of June nor from the 20th to the end of June, and was out much of the time during July and August; that Thomas Merrill was in Idaho from June 3d to August 28th; that Clarence Merrill was in Portland and vicinity from December, 1928, to November, 1929, with the exception of visits to Salt Lake on June 5th and June 17th and again from some time after the 7th or 8th of September.

It is hardly conceivable that a trained stock salesman or fairly competent business man would conduct himself in the manner described by Skola of Charles S. Merrill's first visit. Nor would such a man on his first visit to a prospective customer offer for sale stock for almost the exact amount the customer had in the bank and at a price and in an amount which if accepted at the time, would give the customer complete control of the corporation for a sum about one-ninth of its value.

I cannot believe the suggestion of a divorce by Mrs. Skola was an invention of the Merrills. It developed rather unexpectedly in the evidence that the divorce specter had hovered

over the Skola home for years, both prior to and after
September, 1929. Mr. D. B. Richards, attorney for Mrs.
Skola, testified with reference to the meeting in Mr. Brown's
office on September 14th as follows (quoting from the ab-
stract) :

"I couldn't say how long I have known Mr. Skola. I became ac-
quainted with him about the time he applied for admission as a citizen
of the United States. I represented him in that proceeding. I have
known Mrs. Skola about the same length of time. It was about 20
years ago.

"I was present when Mr. Skola had a transaction in Mr. Brown's
office but I cannot remember the date. Mrs. Skola came up to my
home the evening of the day before and wanted me to assist her. Her
daughter was with her. Mr. Skola was not there. She stated to me
that her husband had purchased so many shares of stock in the
Deseret Mortuary Company and that he had promised to transfer the
stock into her name in common with his own but now he refused to do
it and she wanted me to intercede for her and see if we couldn't have
him transfer the stock as before agreed. I had been called upon to
represent her in a divorce proceeding, but not on that occasion. I can-
not remember anything being said about it. I was called upon a num-
ber of times to represent her in divorce proceedings and I knew at this
time that domestic troubles existed between them but to say that she
asked me or mentioned the fact on that occasion I wouldn't say.

"It was a number of years prior to September, 1929, that I was
called upon in reference to a divorce by Mrs. Skola and at various
occasions after. I may have prepared a complaint for her, but I think
it was never filed. I could not say when that was. I had not prepared
a complaint immediately before this. I had not heard of the contro-
versy about this stock prior to her visit on the 13th of September,
1929."

Mr. Hugh B. Brown, the attorney at that time represent-
ing the Merrills, testifying concerning the same meeting
said:

"There was nothing said in my office about divorce at that time.
I met Mr. and Mrs. Skola at another time and they said they had had
some difficulties and discussed with me the matter of a divorce. I do
not know when that was. It was in the Mortuary office, 1045 State
Street, and subsequent to this event."

The preponderance of the evidence is against the claim of John Skola that on September 14th he was coerced into buying the stock and signing the agreement, Exhibit 3, by threat of divorce. Prior to that meeting Skola had signed an agreement in writing with the Merrills to buy the ■ stock. The controversy on that day was whether the stock should be issued to him in his own name or in the names of himself and his wife. The controversy was not between Skola and the Merrills but between Skola and his wife. A stock certificate had already been made out in the name of John Skola and was before the parties at the meeting and as a result of the discussion there Mrs. Skola's name was added to it. The record shows that prior thereto stock certificates had been made out in the names of both, and the testimony of the Merrills was that Skola had changed his mind after first telling them to make them out in the names of both he and his wife and directed them to make the certificates in his own name. When Mrs. Skola discovered this she consulted with her attorney and brought him to the meeting and as a result had her name added to the certificates and had her husband sign the agreement, Exhibit 3. This agreement is as follows:

"Agreement made this 14th day of September, 1929, by and between John Skola, farmer of Salt Lake City, and Vesta Mauermann Skola, wife of the said John Skola.

Witnesseth:

"That whereas, the said John Skola has purchased from Charles S. Merrill certain stock in the Merrill Mortuary Company, a Utah Corporation, and

"Whereas, the said John Skola after paying for the said stock has certain funds remaining in the Zion's Savings Bank & Trust Company at Salt Lake City, Utah, and

"Whereas, it is desired that the parties hereto have access to said remaining funds and other funds as hereinafter mentioned.

"Now this agreement witnesseth:

"The said John Skola agrees with the said Vesta Mauermann Skola that he will have his bank account in the Zion's Savings Bank & Trust Company at Salt Lake City, transferred to the joint account of himself and the said Vesta Mauermann Skola.

"Further, that he will deposit in said bank account from time to time all moneys received by way of interest or dividends on the stock hereinbefore mentioned in the Merrill Mortuary Company. That said stock shall be placed in a Safety Deposit Box, and that each of the parties hereto shall have a key and access to the said box.

"The said Vesta Mauermann Skola agrees that she will not raise any objection or in any way interfere with the action of the said John Skola in connection with the purchase of said stock.

"In witness whereof, the parties hereto have hereunto subscribed their names the day and year first above written.

"John Skola

"Vesta M. Skola.

"Witness:

    "Charles S. Merrill."

Mrs. Skola testified: "I got my attorney because I was going to get a divorce if he didn't want to buy the stock." The testimony of all the persons present at this meeting except Mr. and Mrs. Skola was to the effect that Mrs. Skola did not threaten a divorce to compel the sale, but rather threatened to prevent the sale unless she was protected by having her name on the stock certificate. On this point the disinterested witnesses and the record evidence corroborate the Merrills rather than the Skolas. The written contract shows a sale by Charles S. Merrill of Merrill Mortuaries stock and not a sale or pretended sale by the Deseret Mortuary Company of its own stock.

After the meeting in Mr. Brown's office the parties went to the Zion's Savings Bank where the stock certificate was delivered and the money received in payment therefor. Skola's testimony tended to show a continuance of the claimed coercion and deception even at the bank. Mr. McEwan, the assistant cashier of the bank and an entirely disinterested witness, testified as follows respecting the transaction had at the bank:

"I remember on at least one occasion prior to the 14th of September Mr. Skola came in and talked to me about his proposed investment. It was 2 or 3 days before that. Mr. Skola notified us that he contemplated cancelling or revoking a trust he had previously created and that the money was to be invested in Merrill Mortuaries, or Deseret

Mortuary—Deseret Mortuary I think it was, but the title I couldn't say definitely. I advised him against it. I told him I thought it was a rather hazardous venture and considered it very speculative and tried to persuade him not to do it. He said he intended to do it and he wanted to know what steps would be necessary for him to procure his money. He was informed and the necessary steps were taken.

"On the 14th Mr. Skola and Mr. Merrill and I think Mr. Brown were present. The revocation had been prepared; the securities described, and it was signed and witnessed and receipt taken for the money. The money was delivered in a cashier's check. I am not positive about that. His account might have been credited. I have the instrument which revoked the trust with me. It is marked exhibit 41. It was prepared after he first notified us he was going to withdraw the money. It was executed the day he drew the money out."

Skola denied he talked with McEwan or that McEwan had advised against the investment and said that Mr. Brown, the attorney, went to the bank a few minutes ahead of the others and when the others got there the cashier's check was ready, thereby conveying the impression that Brown was the one who gave notice to the bank of the desired withdrawal of the money and had the revocation of trust and cashier's check prepared. Again, in this respect, he is flatly contradicted by the testimony of the disinterested witnesses.

The trial court made a finding, "That on September 14, 1929, the common stock of Merrill Mortuaries, Inc., was of no value and its preferred stock was of a value of about 20 per cent of its par value." This finding, I think, is entirely unsupported by the evidence. It rests on testimony in the nature of an opinion given over objection by R. H. Whitehead, a former salesman of burial certificates for the Deseret Mortuary Company and of stock of Merrill Mortuaries, Inc. At the time he testified he had been discharged by the receiver and had asserted a claim for a large amount against the Deseret Mortuary Company, which claim had been denied. He testified that the common stock had no market value and that the preferred stock had an intrinsic value of about 20 per cent of its par value. On cross-examination he said he had sold Merrill Mortuaries

stock in Utah and Montana and that he believed it was a fair investment and that the purchasers would make money "if everything went right" and the company had good management. He further testified he did not take into consideration the value of any stock of the Deseret Mortuary Company owned by the Merrill Mortuaries, Inc., when he gave his estimate of value. This statement alone would destroy the evidenciary value of his estimate, since the most valuable asset of the Merrill Mortuaries was its holding of Deseret Mortuary Company stock.

Assuming there were fraudulent representations made by the Merrills in the respect charged, yet I think Skola may not now urge rescission. He held the stock, sold some of it, borrowed money on it, collected and received dividends, attended stockholders' meetings and voted it over a period of three years and eight months. All of the facts concerning which he alleges misrepresentation could have been learned by him, if indeed he did not already know the truth about them, very shortly after the transaction of September 14, 1929. He claims the Merrills represented to him in numerous conversations for three months before the sale that "the church is behind it" and would not let it fail. During that time he had ample opportunity to learn the truth of the representations. So far as we know, he made no inquiries. After he purchased the stock he attended two of the annual stockholders' meetings and one or more directors' meetings of Merrill Mortuaries, Inc. At the stockholders' meetings full information was obtainable as to who the stockholders were, the amount of stock issued, and what, if any, church position they or any of them held. There is not anything in the record to indicate that he could not have had access to the books and records of the company at any time for the purpose of learning these facts. I think he cannot wait nearly four years until the company, by reason of the financial depression then existing, the opposition of the undertakers and the passing of adverse legislation in some of the states where the company was operating, found

itself in a condition of financial distress. It would seem more than a mere coincidence that the time fixed by him when he learned of the fraud, that is, in July of 1932, is almost the exact time when the financial depression reached its lowest point and was only two months before the Deseret Mortuary and the Merrill Mortuaries, Inc., went into receivership. Notwithstanding the distressing business conditions following the stock market crash in October of 1929, Merrill Mortuaries seemed to enjoy a period of prosperity. The testimony discloses that between September, 1929, and October of 1930, more than $400,000 worth of its stock had been sold throughout the West.

If the representation of the Merrills was that they were selling Skola Deseret Mortuary stock, that idea was dispelled and the fact that they were guilty of deception was brought home to him when he found on September 14th that he was actually buying Merrill Mortuaries stock. He signed the agreement with his wife, Exhibit 3, in which it was plainly recited that the stock purchased was of the Merrill Mortuaries, Inc., and that the purchase was from Charles S. Merrill. Skola sought to avoid the effect of this agreement by saying that he had been coerced into signing it. But even so, he was in possession of the facts and had ample time thereafter to make inquiry as to the true facts and to give notice of rescission within a reasonable time or to take other action for the protection of his rights. He seems to have been satisfied until he found the company in dire financial distress and on the verge of receivership.

The testimony that Mrs. Skola had been influenced by the Merrills to hold the threat of divorce over her husband's head in order to compel him to buy the stock seems to be too unreal for belief. All the parties were members of the L. D. S. Church and Mrs. Skola pretends to be a devout believer in its doctrines. She must have known that such suggestions were wholly contrary to the teachings of that church. It is too well known for controversy that one of the fundamental doctrines of that church is the sacredness of the marriage

relation. While divorces are tolerated, the church certainly discourages them. It is hardly conceivable that any fairly intelligent stock salesman would use such an argument in an attempt to sell stock to a member of the church. As already indicated, the specter of divorce had been hanging over the Skolas and threatening their domestic happiness for some years. I cannot believe that the idea of divorce was first proposed by the Merrills. It is reasonable to believe when they found that Mrs. Skola had entertained the idea of divorce, on inquiry from her as to how best to protect her rights in the property of Skola, the Merrills may have suggested in the event of a purchase of stock that it could be issued in the names of both.

Cross-examination of Skola shows rather plainly that he was not much impressed with any representation of "the church is behind it." He seems to have relied for rescission of the contract chiefly on the claim that he was forced into the deal by reason of the threats of Mrs. Skola that she would divorce him if he did not buy the stock and that he did not discover until July of 1932 that Mrs. Skola had been influenced in this respect by the Merrills. It is difficult to believe that these people, living in the same house and, as they say, in amicable relations, would not discuss the events leading up to the purchase of the stock and that Skola would not discover the true facts connected with it, whatever they might have been, long before July, 1932.

In any event the judgment against the Deseret Mortuary Company should be set aside. Whatever the relationship of the Merrills to that corporation, it is clear that the Deseret Mortuary Company did not own or have any interest in the stock of Merrill Mortuaries, Inc. Whether the stock transferred to Skola belonged to Charles S. Merrill personally or to the Merrill Mortuaries and was being sold by Merrill in order to evade the effect of the Securities Act, it is clear it did not belong to the Deseret Mortuary Company. If rescission is had and the stock is

turned back in an attempt to place the parties in status quo, it would go either to Charles S. Merrill or the Merrill Mortuaries. It would not go to the Deseret Mortuary Company. The money was paid by Skola to Charles S. Merrill who deposited it to his own account. Notwithstanding Charles S. Merrill may have dominated both of these corporations by reason of his stock ownership, it remains the fact that some five or six thousand people had invested nearly $100,000 in Deseret burial certificates and that these people and other creditors have a right to be protected. I can see no reason under the circumstances disclosed by this record for giving the plaintiff Skola a preference as against creditors and certificate holders in the assets of the Deseret Mortuary Company, especially when I know that Skola during the three years and eight months attended the meetings of the stockholders and directors of Merrill Mortuaries, Inc.; that he traded his stock originally purchased for other stock issued by that company; that he received money from Charles S. Merrill in the nature of interest or dividends; that he sold stock to Merrill and also to Jacob Aures, and during all that time had ample opportunity to learn all the facts with respect to the claimed fraud and failed to take any steps toward protecting himself until the company was in financial distress.

Much more might be said in support of the views expressed herein, but this opinion is long enough as it is.

ELIAS HANSEN, C. J., and WOLFE, J., concur in the views expressed in this opinion, and WOLFE, J., and the writer concur in the opinion of ELIAS HANSEN, C. J., and in the following disposition of the case: That the judgment heretofore entered be reversed and the cause remanded to the district court of Salt Lake county, with directions to dismiss the cause as to the Deseret Mortuary Company, and grant a new trial as to the other defendants; that the parties have permission to amend the pleadings if they so desire. Costs to appellants.

ELIAS HANSEN, Justice (concurring).

A careful reading of the transcript convinces me that plaintiff is not entitled to a rescission of the contract whereby he purchased the stock involved in this controversy. It is difficult to believe that plaintiff was as credulous as he claims. It is still more difficult to believe that ■ his credulity continued to paralyze his mind for a period of three and a half years after he purchased the stock. Even if the findings touching the alleged fraud are not disturbed, still plaintiff is not entitled to rescission. During the period that elapsed between the time of the purchase and the bringing of this suit, plaintiff could have readily ascertained the truth or falsity of the representations which he claims induced him to purchase the stock. He attended stockholders' and directors' meetings. The only reasonable inference to be drawn from the evidence in the record before us is that plaintiff was content with his deal until he was disappointed in his hope and expectation of realizing large profits from his investment. Even if there were some overreaching of the Merrills in selling the stock, still the remedy of rescission is not open to plaintiff because he failed to act within a reasonable time after he discovered or had a reasonable opportunity to discover the fraud. Rescission is denied whenever the one asking it fails to act promptly after the discovery of the fraud, or, what amounts to the same thing, after he has had a reasonable opportunity to discover the fraud. 6 R. C. L. 935, § 317. That plaintiff had ample opportunity to discover the fraud practiced upon him, if any, soon after the occurrence of the transaction complained of is clear. He should not be permitted to hold the stock to see if it would turn out to be a profitable investment despite the claimed fraud and then when it did not prove profitable recover back all that he paid. It may be that plaintiff has an action at law for fraud, but upon this record he is not entitled to rescission.

The judgment should be reversed and the cause remanded to the district court of Salt Lake county with directions to

grant a new trial, and, if plaintiff so desires, he should be permitted to amend his complaint so that he may be heard in an action for damages. The case of *Summers* v. *Provo Foundry & Machine Co.*, 53 Utah 320, 178 P. 916, is a precedent for such an order.

EPHRAIM HANSON, Justice (dissenting).

The plaintiff alleges that he was induced to buy certain shares of stock of the defendant Deseret Mortuary Company through false and fraudulent representations made to him by defendants and also by reason of threats made by his wife to the effect that she would divorce him unless he purchased said stock. He alleges that defendants, by false and fraudulent representations, and in order to enlist her in their scheme to sell him stock, so incited and inflamed her against him that she threatened him with divorce unless he purchased the stock. Upon discovering that the representations were false and fraudulent and that his wife, in threatening him with a divorce, was acting under the urgence and insistence of the defendants by reason of their false and fraudulent representations to her, plaintiff offered to return said stock and demanded return of the $30,000 paid therefor, with interest. He then alleges that defendants have failed to return said money except the sum of $3,430. He prays judgment for the sum of $30,000 with interest, less the said sum of $3,430. Defendants answered individually and put in issue the principal allegations of the complaint and allege affirmatively that the stock sold to plaintiff was stock owned personally by defendant Charles S. Merrill, which had been issued to him by Merrill Mortuaries, Inc.; that by reason of certain acts of plaintiff in respect to said stock alleged to have been performed after he claims he discovered the fraud, plaintiff waived any right to claim rescission and became estopped to claim any relief against defendants. The trial court entered judgment in favor of plaintiff rescinding and annulling the purchase of said stock and awarding him judgment for the principal and interest less the sum so paid. The

court further ordered that the stock tendered in court by plaintiff be delivered by the clerk of the court to defendants upon the payment of said judgment.

I deem it unnecessary to make a more detailed statement of the pleadings as this would involve needless repetition, since all of the essentials thereof are covered in the court's findings of fact and it is necessary to review said findings in order to pass upon most of the assignments of error relied upon by defendants.

There is no dispute as to the following findings made by the trial court: The Deseret Mortuary Company is a Utah corporation, incorporated in 1925 and continuing as such during all of the times covered by the complaint with its principal office in Salt Lake City; that on September 13, 1932, a receiver was appointed for said company and defendant Lewis B. Merrill is the present receiver; that defendant Merrill Mortuaries, Inc., was incorporated under the laws of Utah on September 9, 1929, and continued as such until September 13, 1932, when defendant First Security Trust Corporation was appointed receiver for said company. The business of said corporations is the burial of the dead and furnishing services and materials incidental thereto, the Deseret Mortuary conducting such business in Utah and the Merrill Mortuaries in the states of Montana, Oregon, and Washington. Defendant Charles S. Merrill has been the president and general manager of both companies continuously since their incorporation to the time when the receivers were appointed for them. It is also undisputed, and the court found, that plaintiff was born in Czecho-Slovakia and his wife in Germany; that they came to the United States about 1907 and shortly thereafter moved to Salt Lake City, where they have since resided; that prior to 1926 plaintiff gathered waste animal matter and reduced oil, fats and other animal by-products and sold the same, and bought and sold animal hides; that from his business plaintiff had saved and accumulated something over $30,000.

In attacking the findings of fact made by the trial court, each defendant (except Lewis B. Merrill, individually, and against whom no judgment was rendered and who is not concerned in this appeal except as receiver for the Deseret Mortuary) assigns as error that as to each such defendant the evidence is insufficient to sustain each such finding and that there is no evidence that such finding is true. The findings thus attacked, paragraphing them under the same numbers as used by the trial court, may be stated as follows:

(4) That since the incorporation of said Deseret Mortuary Company and Merrill Mortuaries, Inc., and particularly during the times complained of by plaintiff (being all prior to the receiverships), defendants Charles S. Merrill and Clarence Merrill were the managing officers, and, together with Thomas Merrill, were agents of said corporations and that said individual defendants absolutely controlled and dominated the business, property, and affairs of both said corporations.

(5) That plaintiff and his wife have a very limited knowledge or understanding of the English language, written or spoken, and speak and understand it only disconnectedly and with great difficulty; that at all times covered by the complaint plaintiff and his wife were devout believers in the L. D. S. Church and had great confidence in said church and its leaders and in enterprises in which said church and its officers might be interested, all of which was well known to defendants. That on June 1, 1929, and until September 14, 1929, when it was withdrawn, plaintiff had $30,000 on deposit with Zion's Savings Bank & Trust Company. That plaintiff and his wife have had practically no business experience except such as was gained in their animal by-products business.

(6) On or about June 1, 1929, defendants, having become aware that plaintiff had said money, began wickedly and corruptly to conspire and scheme with each other, including the Merrill Mortuaries after its incorporation, to get possession of said money by inducing and compelling plaintiff

to purchase from defendants shares of the capital stock of the Deseret Mortuary, through false and fraudulent representations and promises and through demands and threats of plaintiff's wife induced by inciting and inflaming her mind against plaintiff.

(7) That from June 1, 1929, to September 14, 1929, in furtherance of said scheme and conspiracy, Charles S. Merrill, Clarence Merrill, and Thomas Merrill, acting for themselves and as the managing officers and agents of said corporations, repeatedly offered to sell plaintiff 20,000 shares of common stock of the Deseret Mortuary Company at $1.50 per share, or a total of $30,000, and to induce plaintiff to buy they falsely and fraudulently stated and represented to plaintiff, knowing the same to be false and fraudulent, that plaintiff could and would not lose anything by buying the stock; that the said church and many of its high officials and leaders were financially interested in the Deseret Mortuary and would not allow any of its members who were stockholders to lose anything by such investment; that within two years plaintiff would receive more than $100,000 in profits and that plaintiff would immediately be made a director and said corporation would at once furnish continuous employment to the members of plaintiff's family.

That from about July 1, 1929, until September 14, 1929, still in furtherance of said scheme and conspiracy, and to secure the help of plaintiff's wife in inducing and compelling plaintiff to buy said stock, the defendants wickedly, corruptly, and fraudulently stated and represented to her, knowing the same to be false, wicked, and corrupt, that she had no right or interest in the money in the bank and that she could force plaintiff to purchase said stock if she became angry with him; that if plaintiff did not comply with her request and buy said stock such refusal would give her sufficient grounds for a divorce, and defendants promised her if she would induce and compel plaintiff to buy said stock they would issue to her half of the stock and she would have half the stock and be entitled to the income derived therefrom

and defendants would see that she got half the stock in her own name and she would become wealthy from the profits. That defendants also repeated to her the same false and fraudulent representations relative to the church and its leaders being interested in the company that they made to plaintiff.

That plaintiff and his wife had theretofore been happy and contented together throughout their married life, but plaintiff's wife, relying on said representations and because thereof, became so incited and inflamed in her mind against plaintiff that she demanded that he buy said stock and frequently thereafter, until the purchase of said stock, threatened him with divorce if he refused. That on September 14, 1929, in furtherance of said scheme and conspiracy, defendants also stated and represented to plaintiff that his refusal to buy said stock would give his wife sufficient grounds for her to get a divorce. That all of said statements and representations were false, fraudulent, and untrue and known so to be by defendants and were made for the express purpose of compelling plaintiff to buy said stock and of depriving plaintiff of his $30,000 and of converting the same to their own use.

(8) That on September 14, 1929, the plaintiff, believing said representations and promises and relying thereon, and believing and relying upon the representation that his refusal to buy would give his wife grounds for divorce and believing that she would obtain a divorce and he would lose his wife and family, and not knowing that she had been inflamed and incited in her mind by defendants' false and fraudulent representations or that she was acting at the instance and under the direction of defendants, paid defendants said sum of $30,000 as the purchase price of said shares of stock and would not have done so except for the said representations and the threats of his wife.

(9) That defendants did not deliver 20,000 shares of Deseret Mortuary stock to plaintiff, but after being paid said sum, handed plaintiff a certificate for 3,000 shares of

common stock of the par value of 10 cents a share and a certificate for 1,200 shares of preferred stock of the par value of $15 a share, bearing dividends at the rate of $1.95 a share per year, all being capital stock of Merrill Mortuaries, Inc. That these certificates were made in the names of plaintiff and his wife under an agreement prepared by defendants without plaintiff's consent and which plaintiff was coerced to sign by defendants, no sale having been made voluntarily by plaintiff to his wife. That when these certificates were handed to plaintiff was the first time plaintiff had heard or been advised of the existence of Merrill Mortuaries, Inc., or had seen said certificates. That at said time defendants stated and represented that said corporations were one and the same and that it made no difference to plaintiff, which representations plaintiff believed and relied upon as being true. That at no time did any of said defendants offer to sell plaintiff any Merrill Mortuaries, Inc., stock for $30,000 or any other sum, nor did plaintiff accept any such offer.

That in 1930, plaintiff, not knowing of the facts relating to said false and fraudulent representations and said threats, was induced by defendants to surrender said certificate for 1,200 shares of preferred stock to defendants and received in lieu thereof 200 shares of series C preferred stock of the same company of the par value of $100 per share. That in the spring of 1932, plaintiff, still being unaware of the true facts, sold to defendants four shares of said series C stock and the Deseret Mortuary paid him $100 per share; that in August, 1932, plaintiff, after having become aware of the true facts, employed Jacob Aures as his agent and attorney to collect from defendants the money paid to them and for such purpose delivered said certificates to said Aures with no intent to sell Aures any of said stock. That said Aures, without the knowledge and consent of plaintiff, delivered said certificates to Merrill Mortuaries, Inc., and had issued to him a certificate for 3,000 shares of common and 196 shares of series C preferred stock of said company. Thereafter, upon demand, Aures delivered and surrendered said

certificates to plaintiff, which certificates plaintiff tendered to the court to abide its decision.

(10) That it was not until July 1, 1932, that plaintiff discovered or knew that neither said church nor its officers or leaders were financially interested in said corporations, and that the other representations were false and fraudulent, and that his wife's demand upon and threats against him had been induced by the advice and urgent demands of the defendants. That prior to said date plaintiff did not know and was not informed that his wife could not obtain a divorce from him if he refused to buy said stock. That defendants paid plaintiff a total sum of $3,044 as and for interest upon said sum of $30,000, but plaintiff did not know prior to July 1, 1932, that defendant corporations had not earned sufficient to pay the stated dividends provided for the preferred stock and he did not know of the financial conditions of said corporations. That defendants, on numerous occasions, and when said payments were made, represented to plaintiff that said corporations were making rapid progress and his money had doubled in value and for him not to concern himself but to leave to defendants the conduct of the business. That as a result of such representations plaintiff continued to rely on defendants and had confidence in their integrity in all matters prior to July 1, 1932, and continued to believe and rely upon the representation that said corporations were one and the same until just prior to the commencement of this action.

That on or about July 1, 1932, promptly upon discovery of the falsity of the representations made to him and of the part played by his wife in compelling him to buy the stock, plaintiff rescinded said purchase and demanded return of his money, less the amounts paid, and offered to return said stock certificates, but defendants have failed and refused to pay said money to him.

(11) That of said $30,000 paid by plaintiff a portion was retained by Charles S., Thomas and Clarence Merrill, and many thousands of dollars thereof were delivered to and

used by said two corporations in their business, and the whole of said sum was taken and converted by defendants to their own uses.

That the businesses of Merrill Mortuaries, Inc., and the Deseret Mortuary Company were conducted from joint general offices in Salt Lake City as one unit or organization of a general business enterprise or scheme; that plaintiff visited said general offices on several occasions in collecting his dividend payments; that the said shares of common and preferred stock handed to plaintiff stood upon the corporate records in the name of Chas. S. Merrill, but plaintiff did not know the stock was claimed by or belonged to said Charles S. Merrill. That said stock was so held by said Charles S. Merrill for the use and benefit of and used by all of the defendants in the furtherance of their said fraudulent sale and scheme and for the purpose of obtaining from plaintiff said $30,000 and converting the same to their own uses.

That in the sale of said stock to plaintiff the individual defendants were acting as the managing agents and officers and in behalf of defendant corporations as well as for themselves individually. That the allegations in defendants' answers that Charles S. Merrill was acting solely for his own personal benefit and not as an officer or agent of said corporations and that plaintiff was so informed are untrue. That the allegations of defendants' answers that plaintiff became dissatisfied immediately with the purchase of said stock and offered it for sale and requested said Merrill to sell it are untrue, but that plaintiff, not knowing of the fraud, in February, 1931 and April, 1932 offered to sell said stock to defendants. The allegations in defendants' answers that at a stockholders' meeting in February, 1932, the holders of preferred stock of Merrill Mortuaries, Inc., were offered the right to exchange for Deseret Mortuary Company common stock, which offer was refused by plaintiff who was fully advised as to the nature of the stock and the financial condition of each company, are untrue in that plaintiff was not then advised and did not know the nature of each class of

stock or the financial condition of the companies, and he did not know of the falsity of the representation that the said church and its officials and leaders were financially interested in said corporations.

That at no time after discovering the fraud practiced upon him did plaintiff deal with said stock as his own or otherwise use the same, the only use, subsequent to such discovery and rescission, being the employment of Aures to collect his money, for which purpose only the certificates were delivered to Aures.

(13) That on September 14, 1929, the common stock of Merrill Mortuaries, Inc., was of no value and its preferred stock was of a value of about 20 per cent of its par value.

(14) That plaintiff was never a director and did not understand what was transacted at the stockholders' meetings attend by him.

(15) That plaintiff has not elected to retain said stock and deal with it as his own, and he has not elected not to rescind said sale, nor has he waived any right to claim a rescission, nor has he waived any claim against the defendants on account of said fraudulent representations, nor is he estopped to claim relief against defendants, nor has he been guilty of laches, but plaintiff promptly disaffirmed and rescinded said purchase of stock upon discovery by him of the facts constituting the fraud.

This being an equity case, we are bound to examine and pass upon the evidence to determine whether the findings made by the trial court are supported by the evidence. But such findings "will not on conflicting evidence be set aside, unless it manifestly appears that the trial court has misapplied the facts proved or made findings against the weight of the evidence." *Hanson* v. *Mutual Finance Corporation*, 84 Utah 579, 37 P. (2d) 782, 785. See, also, *Clark* v. *Clark*, 74 Utah 290, 279 P. 502. Since the Merrill Mortuaries, Inc., made a motion for nonsuit at the close of plaintiff's evidence and relies upon the trial court's denial of said motion as

error, we will first restrict ourselves to a statement of the evidence as it stood when plaintiff rested.

Plaintiff's testimony shows that he first met Charles S. Merrill about June 15, 1929. Charles came to plaintiff's home and stated he was president of the Deseret Mortuary Company and wanted to sell stock. He stated he would show plaintiff how to make lots of money. They went behind the hogpen, which plaintiff was then cleaning, and Charles stated he knew plaintiff belonged to the church of which he and his brothers were members. He offered to sell plaintiff 20,000 shares of Deseret Mortuary stock at $1.50 a share; that he would use plaintiff's money to build a mortuary for $25,000 and it would be worth $50,000 as soon as it was ready; that the business doubles the money every year and plaintiff would make $120,000 in two years. He stated further that plaintiff need not be afraid, he could not lose anything as the church was behind it and they had so many church officials, naming one in particular. Plaintiff answered that he did not want the stock but did want a job. Charles advised him to think it over and he would send his brothers to see plaintiff.

The next day plaintiff went to the company office to see about a job. Charles then urged him to buy the stock, saying, "I will make you a director and give your wife and girls a job." He repeated that the church was behind it and plaintiff would not lose. Plaintiff stated he did not want to spend his money, as sometimes he was sick and needed it. The next day Charles came to plaintiff's home again and repeated the same representations. A few days later Thomas and Clarence Merrill came to plaintiff's place. They repeated practically the same statements made by Charles relative to earnings and the church and its officials being financially interested in the company. These visits occurred once or twice a week until the latter part of August and the same representations and urgings were repeated. Plaintiff was told how much money they were making and they urged him to invest early before others and to invest his

entire $30,000. On one occasion Thomas showed him a book containing a list of the church officials whom he said were connected with the Deseret Mortuary.

On the morning of September 13th following, Clarence and Thomas came to plaintiff's home and upon plaintiff's refusal to buy the stock they stated they would make him buy. They went away, but shortly thereafter plaintiff's wife came to plaintiff and told him she would get a divorce unless he came to the house and talked to these men. Clarence and Thomas were in the house. The latter advised plaintiff he had no right to have all the money, that half of it belonged to his wife. Plaintiff's wife demanded that he buy the stock or she would divorce him; the church was behind it, she said, and they could not lose but would make lots of money. That plaintiff, thinking the church was behind the company and not wanting his home broken up, finally agreed to buy. That from about July 20th plaintiff's wife kept urging him to buy and about once a week they would become involved in some kind of a fight over the matter and she would threaten him with divorce. On one of these occasions she cut his hand with a knife.

In the afternoon of September 13th, Thomas Merrill called and took plaintiff and his wife to the company office. There plaintiff was told by Charles that in order to get plaintiff's money their attorney, Mr. Brown, would go to the bank. Charles stated to Brown that he had sold plaintiff some Deseret Mortuary Company stock for $1.50, the same as they got it for. Brown went to the bank, but it was closed, and plaintiff was told to come back in the morning. That Mr. Strebel, the auditor, showed plaintiff a balance sheet of the Deseret Mortuary showing the company to be worth $160,000.

The following morning plaintiff and his wife resumed their quarreling over the stock. Plaintiff did not want to buy, but she threatened him definitely with a divorce and left him on the way to the company office. When plaintiff arrived at the office, Charles suggested they go to

Brown's office.  Mrs. Skola and her attorney, D. B. Richards, were there.  There a paper was drawn by Brown and Richards, and plaintiff was given five minutes in which to sign it or his wife would get a divorce.  Plaintiff had been told that his refusal to buy would furnish his wife with grounds for a divorce.  They were all urging him to sign. Plaintiff, not knowing what to do, asked Brown for his advice and Brown advised him to sign, which he did.  Thereupon the Merrills and Skolas all went to the bank.  Brown had preceded them and when they got there a check for $30,000 was already made out to plaintiff and he indorsed it and gave it to Charles.

Plaintiff further testified that if he had not believed that the church was interested in the company and that his wife would and could get a divorce if he did not buy, he would not have bought the stock, as he could not spend the money on account of his sickness.  On cross-examination he admitted having testified in a deposition that he did not want the stock even though the church was behind it and that his only reason for buying was because his wife would divorce him if he did not.  But from his testimony as a whole it is clear that the fact that he believed the church was behind the company had a controlling influence in his decision to buy the stock.

Mrs. Skola testified that the same representations that were made to her husband, as to the church being behind the Deseret Mortuary Company and its officials being financially interested, were repeatedly made to her by Clarence and Thomas.  They apparently showed her the same book with the names of church officials in it whom they claimed were connected with the company.  It also contained pictures of some of them, one in particular being referred to.  Her testimony also shows that these men advised her that half of Skola's money belonged to her, that he did not treat her right and the money should be in her name or he could throw her out.  They impressed upon her the great profits that would come from buying the stock and

that if she would help them they would help her get her share of the stock. After she had told them she had talked to plaintiff about buying the stock and that he did not want to spend his money, they then advised her she could get a divorce, get all his money and have a good time; that she would become wealthy and could go to Germany to gather her geneology and do temple work. That she finally advised her husband that if he did not buy the stock she would divorce him. This led to frequent quarrelings, both parties becoming so angry that their differences finally led to blows. Mrs. Skola wanted to buy because the church was behind the company, there were no crooks in the church and she wanted to deal with righteous men. She and her husband fought every day about it.

Plaintiff's daughter also testified that before the Merrills' advent her parents got along well together, but that thereafter they quarreled almost daily, her mother threatening her father with a divorce if he did not buy the stock. Every time the Merrills came around the Skolas would quarrel, and this continued until about the second week in September, when their quarreling ceased. Both Mr. and Mrs. Skola testified that they were congenial prior to the stock deal.

Finally on September 13th, Mrs. Skola peremptorily demanded that plaintiff purchase the stock or she would divorce him. She further testified that plaintiff then agreed to buy, but in order to make sure the deal would go through and to protect herself so she would get half the stock she had her attorney Mr. Richards, present on September 14th when the stock deal was closed. She testified she saw her attorney the evening of the 13th and told him she wanted a divorce if her husband did not buy the stock. That she and her attorney insisted upon plaintiff signing the agreement at Brown's office assuring her a half interest in his bank account and in the income from the stock. That she was angry because her name had not been put on the stock certificates when they were presented at Brown's office and appeared to be in Skola's name only. That she had fought so hard to get her

share, and the Merrills had promised her half and said they would see she got it, that she insisted, therefore, that they keep their promise to her and have her name placed before Skola's on the certificate, her attorney and Brown agreeing that she could get her half by adding her name to the certificate. That under these conditions plaintiff signed the agreement and his wife's name was inserted before his on the stock certificates.

R. H. Whitehead, a former employee of the Deseret Mortuary, testified that a few days before the sale, Clarence and Thomas had just returned from the Skola home; that they were laughing about the whole scheme, and in response to an inquiry by Charles as to what luck they had, they replied they had the "old lady" on their side. They referred to her several times as the "old girl." They said they had told her if they got "old man Skola" to buy, they would see that she got her share. This witness also testified that, in another conversation between the three Merrills, Charles said, "We are sunk if we do not get Hugh B. Brown to get that money from the bank." They said Mr. Spencer of the bank would not dare turn Brown down because of their church positions.

The foregoing briefly summarizes the plaintiff's evidence as to the representations and the coercion which induced him to buy the stock. It becomes necessary to review plaintiff's evidence as to the other elements in the case. The stock that was actually delivered to plaintiff on September 14th consisted of 3,000 shares of common and 1,200 shares of preferred stock of Merrill Mortuaries, Inc., having a par value of 10 cents and $15 per share, respectively, or a total par value of $18,300. Plaintiff remonstrated against taking this stock as he had bought Deseret Mortuary Company stock, having never before heard of Merrill Mortuaries, Inc. Upon being assured by Charles that these two companies were one and the same and it made no difference whether he got stock of the one or the other, he accepted the stock so delivered to him. His wife also testified that Charles assured

them the companies were the same. The Merrill Mortuaries, Inc., was incorporated September 9th, only a few days before this sale took place. It appears from the testimony of Mr. Whitehead that the idea of organizing the Merrill Mortuaries to take over the various companies controlled by the Merrills situated in Utah, Montana, and Oregon, including the Deseret Mortuary Company, was conceived in the middle of the summer of 1929. The plan began to take definite form a week or two before September 9th when Whitehead came to Salt Lake City and helped Merrill in the stock organization set-up. Whitehead was employed as a stock salesman in Utah immediately upon the organization and was to receive an overriding commission on stock sold in Utah of 2 per cent. At first they did not have a permit to sell stock, but they were instructed by Charles to explain they were selling his personal stock. They were furnished with a consolidated balance sheet of all the mortuaries showing their earnings, as a basis for selling Merrill Mortuaries stock. Charles frequently stated that the three companies, Deseret Mortuary, Merrill of Montana, and Gateway Mortuary, were just one big family. A prospectus was prepared for stock-selling purposes on Merrill Mortuaries letterheads, containing a statement that "The following is a partial list of mortuaries we have established which have paid for their working capital within the period of time shown," and then referred to Salt Lake City, Provo, Price, Butte, and Portland, showing their starting capital and their capital as of December 31, 1929. When plaintiff's money was received, Charles stated, "That is fine; that will save Portland," as the mortuary in Portland was badly in debt. The physical assets of the Montana and Portland mortuaries were transferred to Merrill Mortuaries, Inc. Whitehead was paid his 2 per cent. commission, or $600, of the Skola money by Charles right after the deal was closed. Over objection, Whitehead testified Merrill Mortuaries common stock had no real or market value and its preferred stock had no market value but had

an intrinsic value of about 20 cents on the dollar. The stock that was sold was sold at par.

E. W. Bluemel, a former employee of Deseret Mortuary, and who had charge of the Salt Lake City branch of Merrill Mortuaries after its incorporation, testified that when the latter company was incorporated he traded his Deseret Mortuary stock for stock in that company at Charles' suggestion, as the latter company was taking over the Deseret. It was to be known as the Deseret in Utah as it was already so known, but outside of Utah it was to be known as Merrill Mortuaries. Shortly after plaintiff bought his stock, Charles told plaintiff his money was going to be used to build up the mortuaries. Merrill told Bluemel he was going to use the money to remodel some places and pay on bills in Utah and other mortuaries where needed. Bluemel asked how a sale could be made to Skola without a permit from the Securities Commission and he was told by Charles not to worry, that "I will do it under my own name. We can transfer it to the company."

It further appears from plaintiff's testimony that he sold four shares of preferred stock to Charles and the Merrill Mortuaries under a written agreement dated April 12, 1932, by which said defendants agreed to buy twelve shares at the rate of one a month for $100 each. The last sale and payment therefor was made the latter part of June, 1932, only after plaintiff had employed an attorney to get his money. Plaintiff's attorney at that time told plaintiff the church was not behind the company. In June, 1932, while plaintiff was having trouble getting his money, his wife told him of her part in the stock transaction. Charles failed to provide funds for the purchase of any more of plaintiff's stock and plaintiff some time about July 1, 1932, tendered the stock back to Charles and asked for his money back. Charles promised to pay it all back October 5, 1932. About July 1, 1932, plaintiff's wife consulted Mr. Aures whom she thought was a German lawyer. He promised to collect their money and

plaintiff indorsed the stock to him. Aures gave plaintiff a note for the stock and definitely promised to have his money for him in a month. Not receiving any money from Aures, they consulted Mr. McKay in October, 1932, and through his efforts Aures delivered back the stock which had been issued in his name in the same number of shares as were delivered to him by plaintiff. In order to get the stock back, however, plaintiff had to pay Aures $200 for his attorney's fees. To obtain this money, plaintiff pledged two shares of the preferred stock. This was paid off and the stock redeemed after this action was commenced. Plaintiff told Clarence and Lewis Merrill he had sold and transferred the stock to Aures who had given his note for it, when they came to see him about transferring the stock to Aures.

It further appears from plaintiff's testimony that shortly after he bought the stock he began making demands upon Charles for dividends. Charles told him he would pay two and one-half months' interest in December, 1929, and plaintiff was paid $487 at that time. In June, 1930, Charles gave plaintiff a check for $1,170. In December, 1930, he gave plaintiff a Deseret Mortuary check for $887.50. In January, 1932, plaintiff received $495. As a condition to receiving these dividend payments, plaintiff executed an assignment to Merrill Mortuaries of the dividends for the periods in which the dividends would accumulate on the stock at par. When these assignments were made, Charles told plaintiff his money was all tied up in the two companies or mortuaries and unless he signed, Merrill could not pay him the money. Charles also assured plaintiff when the latter would come to request payment of interest, that the company was doing well and his money had doubled and that he need not worry about the business, as they would take care of it. Plaintiff did not know at any time the real financial condition of the company.

In October, 1930, after being repeatedly urged to do so by Lewis Merrill, plaintiff exchanged his 1,200 shares of

preferred stock for 200 shares of preferred stock of the par value of $100 a share. Charles Merrill at that time agreed to buy from plaintiff 20 shares of preferred stock a year and plaintiff agreed to allow Merrill Mortuaries to take back the $2,000 bonus (the difference in the par value of the stocks exchanged) from dividends received by plaintiff in excess of $2,400 a year. No stock was purchased under this agreement.

Bluemel wrote out all four checks which were given in the purchase of the four shares, and they were all Deseret Mortuary checks. Bluemel also testified that a daily report of the funerals was sent in to the general office. Later the money was deposited and a duplicate deposit slip was sent in with the bills and the bills were paid by the general office. This did not work well, so later each mortuary paid its own bills. When a deposit was made, 10 per cent of the amount would accompany the daily report to the general office of the Merrill Mortuaries. Both companies had offices together and the same persons had charge of the affairs of each.

Jaren L. Jones, a University student, testified he was employed by the Deseret Mortuary for a week about September 14, 1929. On that date he bought $150 worth of stock in Merrill Mortuaries. It was being sold in units of six shares of preferred and fifteen shares of common for $150. Jones wondered whether the stock he bought was the stock he thought he was getting and he was told that the Deseret Mortuary was included in and was a part of Merrill Mortuary.

The written agreement made between Skola and his wife in Brown's office (Exhibit 3) recites that plaintiff had purchased from Charles S. Merrill certain stock of the Merrill Mortuaries, Inc., and after paying for the same had certain funds left in the bank and that the parties desired that each should have access to such funds. That, therefore, plaintiff agreed with his wife that he would have the bank account transferred to the joint account of himself and wife and

would deposit in such account all moneys received from income on said stock and the stock would be placed in a safe deposit box to which each should have access. Mrs. Skola agreed not to raise any objection nor to interfere with the action of plaintiff in connection with the purchase of said stock.

The forgoing summarizes plaintiff's evidence as it stood when he rested. We shall now review the evidence adduced by defendants before passing upon the question of the motion of Merrill Mortuaries for a nonsuit, so that needless repetition may be avoided.

Frank R. Slater testified that he and his brother tried to sell Skola a burial certificate in May, 1929, but Skola wanted to invest in stock. In August, 1929, Charles Merrill stated he was enlarging the business and wanted to sell stock, so Slater went with him to plaintiff's home, having been informed that Skola had a large sum of money. Slater did not see Skola but talked with his wife, who told him her husband was stingy and mistreated her. He had not met her before and only talked with her ten or fifteen minutes. He told her he was with Deseret Mortuary Company and they were there to sell Deseret Mortuary stock.

Anton Strebel testified he was supervising auditor for the Deseret Mortuary from 1928 to 1931. He met Skola about the 10th of September, 1929, at the office when Charles, Clarence, and Thomas Merrill were present. He prepared a consolidated statement of the mortuaries for Merrill Mortuaries as of July 31, 1929, beginning this work about the middle of August. He spoke German and Clarence asked him to explain the statement to Mr. and Mrs. Skola, and they, not being able to understand English, wanted him to explain it. They asked the net worth of the company. Strebel explained the accounts receivable, cash in bank, buildings, and equipment and the liabilities. The net worth was about $250,-000. These figures were based upon the book valuations of the Deseret Mortuary. The interested parties owned the en-

tire stock of both. The issued shares of the Deseret Mortuary were 18,775. From the records he could state that Charles Merrill was not in Salt Lake City between June 1 and 17, 1929, nor was he in Salt Lake City from June 20th to the end of June. He was out of town most of July and August. Thomas Merrill was in Idaho from June 3 to August 28. Clarence Merrill was in Portland territory from December, 1928, to November, 1929, except for visits to Salt Lake City. He was here from June 5th to 17th. He came back about September 7th. Charles owned practically all of the Deseret Mortuary stock, except the 100 shares and qualifying shares held by others. This stock was all transferred to the Merrill Mortuaries.

Lewis B. Merrill testified he first met plaintiff in May, 1929, when plaintiff came to the company office; that he had a bank book and told Lewis he had $30,000 and wanted to invest in the company. Lewis thought he was crazy but took him to Charles' office where plaintiff was told there was no stock for sale, but if they branched out they would remember him. The next time Lewis saw plaintiff was when he got plaintiff to exchange his $15 preferred stock for the $100 preferred. Skola did not want to exchange, but when he was told that they would retire his stock he agreed as he wanted to stay with the company. Lewis next saw plaintiff when he and Clarence came to see him about transferring the stock to Aures. Plaintiff told them he had sold it and got what he wanted. Thomas was in Idaho with Lewis all of the summer of 1929, and did not go to Salt Lake City until just before September 1st.

Charles S. Merrill testified that on September 1, 1929, there were 17,800 shares of Deseret Mortuary Company stock outstanding. The stockholders were himself, Mr. Smith, Mr. Bluemel, Mr. Rasmussen and four undertakers. The company had a branch in Salt Lake City and at various places in Utah. Charles controlled the stock of the Merrill Mortuary of Oregon and the Gateway Mortuary of Butte. The issued stock of Merrill Mortuaries, Inc., was paid for

by the transfer to it of the issued Deseret Mortuary stock. Charles received the stock of Merrill Mortuaries at par. The book value of Deseret Mortuary stock, fixed by an audit, was $14 per share. Preferred and common and class A stock of Merrill Mortuaries was later issued for the assets of the Butte and Portland mortuaries.

Charles first met Skola in May, 1929, at his office, at the time and under the circumstances related by Lewis. Charles next met Skola about the middle of August when he and the Slaters went to Skola's place. Charles told Skola they were forming a new company and if he wanted to invest he could get him preferred stock that was fairly safe. He wanted an 8 per cent investment and Charles told him he thought he could arrange it and would see plaintiff later. Charles next saw plaintiff on the day of the sale. Mr. and Mrs. Skola and attorney Richards came to the office. There being some misunderstanding as to the name on the certificate, Richards suggested they go to Brown's office. Charles told Skola something about their plans and the taking over of the Portland and Montana mortuaries and their plans to build new ones. Clarence asked Strebel to explain the balance sheet. At Brown's office, Charles stated he was selling his own stock and was told by Brown that a permit was not necessary for that. Skola did not want his wife's name on the certificate. Richards threatened an injunction against taking the money if her name was not put on, and Mrs. Skola became very excited and "hot under the collar" and insisted on her rights. Skola asked Brown what he would do and was told it was for him to make the decision. Skola finally agreed and Richards insisted on a written agreement. Exhibit 3 was then prepared and signed and Mrs. Skola's name written on the certificates. Skola made an indorsement on the back of the certificates that upon his death the stock was to be the property of his wife and children. They all walked to the bank together. After some discussion between plaintiff and Mr. McEwan of the bank, in which plaintiff insisted he knew what he was doing, some papers were signed and a check

was made out and given to plaintiff. He indorsed it and Charles deposited the money in his name. They then went to the office where the certificates of stock were delivered and Skola receipted for them on the stock stubs. Charles denies saying the Deseret and Merrill Mortuaries were the same. It appears from the minutes of the stockholders' meeting held November 3, 1930, at which the articles of incorporation were amended and the $100 preferred stock created, that Skola was present and the vote for the amendment was unanimous. The minutes of a stockholders' meeting held February 9, 1932, showed both Mr. and Mrs. Skola present. A resolution was unanimously passed authorizing the exchange of preferred and common stock of Merrill Mortuaries for common stock of the Deseret Mortuary. Skola knew of the difficulties they were having in Montana in June, 1932. Skola was dissatisfied with the return on his stock. Charles had put up money out of his own pocket to advance dividends to plaintiff, and stated, "When I paid him money he gave me assignments." He further testified that he told plaintiff on February 27, 1930, that they were not paying dividends; that he understood all these advances were charged against his personal account. When the check for $887.50 was given, Charles refused to make any further advances, but agreed to buy plaintiff's stock up to $1,200 a year. Charles purchased four shares which were paid for out of his funds and charged to him. He denies the testimony of Skola relative to the visits to Skola's home, the conversations and the representations made and the offer to sell Deseret Mortuary stock.

Charles never thought very seriously of making a sale to plaintiff and thought it unusual that he was eager to buy so much stock; that he made no effort to make a sale. Every one was surprised when the Skolas came in on September 14th to buy. Mrs. Skola said at Brown's office that she did not want a divorce but wanted her rights. None of the money paid by Skola was ever deposited in the name of the corporation; that the Deseret Mortuary owed him $15,000

for advances; that he loaned the company $4,000 for use in Ogden, about $4,000 was used in Portland, $3,000 was loaned for use in Provo. This money likely came from the $30,000. Charles used $3,000 or $4,000 on his home. The four shares of stock purchased from Skola were canceled and put in Charles' file. After the Skola deal the salesmen were furnished with a list of prominent men, including many high officials of the church, who had bought certificates. A letter (Exhibit 40) was sent to stockholders of the Merrill Mortuaries advising them of the right to exchange preferred stock for Deseret Mortuary common stock. Charles did not know whether he told Skola in August that the Merrill Mortuaries would acquire the Deseret Mortuary stock. He states there was not much discussion. Charles paid Whitehead $600 on a basis of 2 per cent of the Skola money. Clarence and Thomas fixed the amount of the commission. Tom and Clarence were paid about $6,000 commission on the deal and received about $5,000 besides. The Merrill Mortuaries owned all the other companies after they were taken over; that there was only one company from the standpoint of buying, but from a corporation standpoint there were two companies. Money was drawn from the various mortuaries as occasion required.

William McEwan, assistant cashier of Zion's Savings Bank & Trust Company, testified that two or three days before September 14th, Skola notified the bank that he was going to invest in Deseret Mortuary stock and McEwan advised against it, but that Skola said he intended to do it and wanted his money; that his trust agreement was revoked on September 14th and he was given his money.

D. B. Richards testified that Mrs. Skola came to his home in the evening of September 13th, stating that her husband had purchased shares of Deseret Mortuary stock and refused to transfer it to her name and she wanted Richards to help her get it. That he had been consulted about a divorce some years previous by Mrs. Skola, but nothing was said on the 13th about a divorce; that plaintiff and his wife had had

domestic difficulties; that he did not go to the Deseret Mortuary office, but he and Mrs. Skola went direct to Brown's office; that neither Mr. or Mrs. Skola understood the English language very well; that he was surprised that Skola agreed, he did not do so voluntarily; pressure was brought against him by all of them by way of argument; that something might have been said about a divorce but there were no threats of divorce nor did the witness threaten an injunction; that the agreement which was prepared was read aloud.

Hugh B. Brown testified that Mrs. Skola wanted her share of the stock and Richards stated he would enjoin the withdrawal of the money if she did not receive half of the stock; that it was agreed to insert her name on the certificates; that the agreement (Exhibit 3) was prepared, read aloud and signed; that nothing was said about buying the stock nor was anything said about a divorce; that he did not go to the company office the day before nor did he go to the bank that day; that he did not precede them to the bank on the 14th; that the only one who urged Skola to accede to his wife's request was Richards; that he (the witness) went to the bank on September 14th in order to be there if any legal question should arise.

Clarence Merrill testified he came from Portland to Salt Lake on June 1st and returned to Portland June 19th; that he returned to Salt Lake on September 3d. That he first met Skola on September 9, 1929, when he and Thomas went to Skola's home; that Thomas told Skola of the organization of Merrill Mortuaries and asked if he wanted to buy stock; that plaintiff asked about the possibilities of the business expanding and what it would take in; that it was explained that it would take over practically all the Deseret Mortuary stock and would take over other mortuaries; that Skola said he had $30,000 to invest but wanted to talk it over with his wife; that he asked if the church owned the company and they told him that it did not, but the men who owned the company were members of the church; that they returned the next day and Skola said he was ready to invest; that Mrs.

Skola asked to have both of their names put on the stock and Skola agreed; that the witness noticed they had had a dispute. He further testified that certificates containing both of their names were made out on September 11th but were voided. That Skola did not come in on the 11th so they visited him on the 12th. That on the side Skola told the witness he did not want his wife's name on the certificates; that she had threatened to leave him and he was afraid she would if she got the stock; that Skola asked that the stock be made in his name only. That they were at Skola's place five minutes the first time, thirty minutes the second visit, and five minutes the third. That Skola came to the office on the 14th prior to the arrival of his wife and Richards. Strebel conversed with him in German. That Richards said unless Mrs. Skola got half of the stock he was going to get an injunction. That at Richards' suggestion they went to Brown's office. That Skola claimed the money and Mrs. Skola insisted that it was as much hers as his. That Skola agreed to her name being added and Clarence inserted it. That the stock was delivered at the bank. That when he and Thomas first visited Skola nothing was said about the church or its officials being in the company nor did they offer him Deseret Mortuary stock. That in August, 1932, Skola stated he had disposed of his stock. The witness denied making the representations testified to by plaintiff and his wife, and stated that he and Thomas went to Skola's place to persuade him to buy stock but he did not need any convincing; he was already convinced.

Thomas Merrill testified he first met Skola on September 9, 1929, when he and Clarance visited him; that they told Skola they were with Merrill Mortuaries and would sell him some stock; that he said he wanted to buy as he had been watching their company for a long time and watched its progress; that he asked them to come the next day as he wanted to talk it over with his wife; that they told Skola the Deseret Mortuary was included in the Merrill Mortuaries. Nothing was said as to the price of the stock. Skola said

he had $30,000 to invest. That the next day he said he was ready to buy right then, but they told him they were not ready as they had no stock certificates because it was Charles' personal stock they were selling. That he promised to come to the office the next day. That it was agreed to put the stock in the name of both Skola and his wife. That the Skolas did not come to the office so the witness and Clarence visited them again. That Skola stated he wanted the stock but did not want his wife's name on it. That Mrs. Skola asked the witness to use his influence to get her name on the stock certificates and he agreed to do what he could. Nothing was said about a divorce. Thomas' description of what took place on September 14th at the company office and at Brown's office is similar to that of the other Merrills, except he stated that Mrs. Skola said at Brown's office that she did not want a divorce; she would rather have part of the stock. He further testified that when they learned Skola had $30,000 to invest it was figured out that he would get 1,200 shares of preferred and 3,000 shares of common stock and the price was quoted to him prior to the time he said he was ready to do business. The witness was not in Salt Lake City from Decoration Day to September 1, 1929.

If the evidence adduced by plaintiff and his witnesses is to be believed, such evidence would unquestionably sustain a finding that plaintiff was induced to buy what he thought was Deseret Mortuary Company stock because of the representations made to him, first, that the church and its leaders were financially interested in the company, and, therefore, he could not lose anything by investing in it, and, second, that his money would double each year and he would become wealthy and his family would be given continuous employment. It would also support a finding that he believed and relied upon such representations. The evidence also shows that the same representations were made to his wife and that she believed them and was induced, because of such representations and by appeals to her cupidity, to assist in the sale by threatening plaintiff with a divorce and disrup-

tion of his family unless he bought the stock. The evidence would also support a finding that such action by her had a controlling influence upon plaintiff in deciding to take the stock. Such evidence is also sufficient to sustain the court's finding that the transfer of stock to Mrs. Skola was not voluntarily made, but was made under coercion exercised by her and the others present at the time. If the sale was brought about by these representations, which admittedly were false and were known by defendants to be false, and by the action and attitude of Mrs. Skola, incited by defendants, then it could make little difference whether plaintiff or his wife had a limited knowledge of the English language. However, the trial court was in a position to pass upon that matter much better than we are, and at least two of defendants' witnesses testified that the Skolas did not understand English very well. Plaintiff's evidence also shows that plaintiff did not know he was getting Merrill Mortuaries stock until it was handed to him and that he then accepted it instead of Deseret Mortuary stock because he was assured the companies were one and the same and that it made no difference which stock he got. It also shows that plaintiff did not discover the falsity of the representations and the part played by his wife until the latter part of June, 1932, and that within a reasonable time after such discovery he tendered back the stock he had and sought a rescission.

It cannot be said, as a matter of law, that plaintiff's evidence is unworthy of belief. The case presents the usual situation of a direct conflict in much of the testimony. There are particulars in which defendants' evidence sustains that of plaintiff's and in some particulars the testimony of defendants' witnesses is in conflict with itself. It would be of no service to further lengthen this opinion by attempting to explain or justify the apparent conflict and discrepancies in the testimony of the various witnesses. I shall proceed rather and discuss the contentions of defendants with respect to specific questions raised by this appeal.

Much is said by defendants about the effect to be given to Exhibit 3, the agreement between plaintiff and his wife, and this agreement is strongly relied upon to show that at the time plaintiff bought the stock he knew he was buying Charles Merrill's personal stock in the Merrill Mortuaries. Also that he was giving his wife part of the stock to discontinue her objections to the purchase of the stock. It should be remembered that this agreement was drawn up by parties opposed in interest at the time to plaintiff; that he was not in any manner consulted as to its contents and that he did not voluntarily sign it. He was told to sign it or take the consequences. The agreement, therefore, could have no binding effect upon plaintiff. Some of the recitals and provisions of the agreement so relied upon by defendants are themselves in direct conflict with testimony as to which there could be no dispute. The agreement, if it is to be given a strict and technical scrutiny, does not mention Merrill Mortuaries, Inc. It does mention Merrill Mortuary Company, and it might be said that when the agreement was read aloud plaintiff was apprised that he was not getting Deseret Mortuary Company stock. Plaintiff understood he was dealing with the Merrills. He may not have understood the purport of the agreement. It was simply read aloud and he had no opportunity to read it. He was then laboring under a strained mental condition. It would not be so strange that plaintiff did not understand the exact significance of the language and names used when defendants' own attorney in drawing the agreement himself misnamed the corporation whose stock was being sold. I cannot say, therefore, that this agreement was either conclusive or of such great weight as to matters of facts therein attempted to be recited or provided for as to warrant me in reversing the conclusions of the trial court.

It appears from the stock book stubs that the stock delivered to plaintiff was transferred from Charles Merrill's stock. There is no evidence, however, to show that stock certificates had been issued to Charles or that he surren-

dered any stock certificates for cancellation so as to have the stock transferred to plaintiff. Such a recital, therefore, does not carry much weight in view of the circumstances existing relative to the transaction here involved. Charles says he was selling his own stock, but the evidence also shows that his personal stock was being used so as to avoid the effects of not having a permit to sell stock from the State Securities Commission, and in reality it was a company transaction and the company was to and did receive the benefits. Under such conditions it could not be said that this was a private transaction between Charles and plaintiff. Plaintiff would not know that it was not unissued stock, and the court did not find that Charles owned the stock. It found merely that it stood on the corporate books in his name and it was so held for the use and benefit of the defendants in the furtherance of their scheme. The company was created to greatly expand the business and new capital was needed and an extensive stock selling campaign was being launched at that very time to obtain such additional capital. To sell personal stock and turn the proceeds to the company under such conditions would be contrary to all human experience.

Bound up in the question I am now discussing is the question as to whether all the defendants are responsible for the representations made and acts done in the sale of the stock and whether they are liable to plaintiff for the money paid by him. The court found the individual defendants were acting for themselves and for and in behalf of the defendant corporations. It is strenuously argued by the Deseret Mortuary Company that it could not be liable as it did not sell any stock and none of its stock was sold. It is likewise urged by Merrill Mortuaries, Inc., that it cannot be held liable as all representations were made relative to Deseret Mortuary stock; that it made no representations and it sold no stock.

Obviously, a corporation cannot do anything except through its officers and agents. The corporation itself is controlled and directed in its activities by the wishes and desires of those who own or control it. We think the evi-

dence, both at the time plaintiff rested and at the time all the evidence was in, sustains the court in holding that the selling of this stock was a scheme in which both the individual and the corporate defendants participated. Charles Merrill held absolute control over both the Deseret Mortuary Company and the Merrill Mortuaries, Inc. He conducted the business as he saw fit. It was his idea to expand the business. He created the Merrill Mortuaries, Inc., and turned over to it the only assets it had at its inception, the stock of the Deseret Mortuary Company. He drew moneys from each corporation indiscriminately with which to pay plaintiff dividends and to purchase his stock, and the same were simply charged to his account. While he says he advanced plaintiff the dividends that were paid out of his own pocket, there is no evidence that the charging of his account ever resulted in paying the same. And it is most singular that he should pay the dividends out of his own pocket and yet have plaintiff assign his interest in unaccrued dividends to the Merrill Mortuaries at a time when, by a stock selling campaign, numerous stockholders would have been added to the corporation and Charles could never be reimbursed by receiving these dividends by virtue of owning all of the company's issued stock. It is evident that in this transaction Charles was using both corporations for his own private business, as no dividends were ever declared or even contemplated and he gave plaintiff this money on dividends either out of the abundance of his heart at the expense of the companies or because he wanted to allay plaintiff's demands and fears concerning a private transaction but at the expense of both companies. It also appears that he absolutely controlled the Oregon and Montana companies and turned them into the Merrill Mortuaries for stock. It sufficiently appears, also, that the Deseret and Merrill corporations were regarded as consolidated companies and were operated as a unit, or at least the Deseret as a unit of the Merrill. It is admitted that Whitehead, who was employed by the Merrill Mortuaries, Inc., as a stock salesman, got the

same commission from the Skola deal as he would have received had it been admitted to be a sale of company stock. It also appears that money could be drawn from any mortuary as occasion required. The corporations were conducted as one as far as buying was concerned. It is impossible, therefore, under the evidence in this case to attempt a segregation of the acts of the individuals from the corporate acts. The evidence is ample to show that, in negotiating the sale in the beginning, the individual defendants were representing and acting as agents for the Deseret Mortuary Company. So far as plaintiff was advised that agency continued to the completion of the sale. There is evidence, likewise, to support the view that the individual defendants were the agents of the Merrill Mortuaries, Inc., in the transaction from the time of its incorporation, although plaintiff had no knowledge of this, and that the transaction was carried on as if it were the same from the beginning and was finally concluded as the same transaction which had been initiated originally as a Deseret Mortuary Company deal. The change that was made, in the light of the evidence, was simply one of form and not of substance, and all defendants continued to hold the same relationship to the transaction as changed that they held before the change.

In answer to the query, "Who made the false representations?" each of the corporate defendants says, "Not I." But neither attempts to explain who it was. Ordinarily a corporation has a definite legal personality separate and apart from its stockholders and officers. But it is well settled that courts of equity and law will disregard such corporate entity and look beyond to the actual persons and facts behind it whenever it is sought to employ the corporate fiction for the purpose of accomplishing or keeping the fruits of a fraud. And likewise, a corporation will not be permitted to hide behind the shield of the corporate entity fiction to absolve itself from responsibility for a fraud committed, by conjuring with the corporate name, when the real facts disclose such responsibility. That the corporate entity will be dis-

regarded in a proper case has been held by this court in *Western Securities Co.* v. *Spiro*, 62 Utah 623, 221 P. 856, 859, where the court says:

"In *Hunter* v. *Baker Motor Vehicle Co.* (D. C.) 225 F. 1006, it is held that the separate entity of a corporation may be disregarded where it 'is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation.' "

The parties have cited and relied upon a number of authorities illustrative of the cases in which the corporate fiction has been or has not been disregarded. I deem it unnecessary to review the same. The reader is referred to the annotations in 1 A. L. R. 610 and 34 A. L. R. 597 for a collection of cases bearing upon various phases of this question. It is impossible and, indeed, inadvisable to lay down a particular legal proposition defining just how and when the corporate fiction will be disregarded. There should and must be as much elasticity in the application of that principle as there is ingenuity in the attempts to prostitute the fiction to the accomplishment of wrongful purposes. Each case must be determined upon its own facts. I am of the opinion that the facts in this case, heretofore referred to and as found by the trial court, are such as to justify a disregard of separate corporate entities in so far as that is necessary to give the relief granted to plaintiff in this action against the corporate defendants.

Such liability cannot be defeated in this case merely because creditors must suffer loss. Existing creditors at the time of the sale cannot complain, and as to them the receiver merely stands in the shoes of the corporation. The purchaser of stock, being himself guilty of no laches or acts creating estoppel, is entitled to rescind as to subsequent creditors, unless they became creditors in ignorance of the fraud in reliance upon the stock purchase, the burden to prove which is on the receiver or subsequent creditors. *Burningham* v. *Burke,* 67 Utah 90, 245 P. 977, 46 A. L. R.

466. See the annotations in 41 A. L. R. 689. There are no pleadings and no evidence in this case which would bring the equities of subsequent creditors, if any, before the court. It also appears that notice of the rescission was given prior to the appointment of the receiver. In such case the subsequent receivership cannot defeat the relief sought by the rescission, though the action in court to rescind was commenced subsequent to the appointment of the receiver. 14 C. J. 601.

It further appears from the evidence, and the trial court found, that the corporate defendants received much of the Skola money, knowing of the facts under which it was obtained. It is admitted that the agent of Merrill Mortuaries, Inc., received a commission on the deal. If the corporations did not intend to be bound by the acts of their agents, it was their duty to disaffirm the transaction. They could not accept the fruits and, when called to account, repudiate the acts of their agents. In *Plate* v. *Detroit Fidelity & Surety Co.*, 229 Mich. 482, 201 N. W. 457, the court says:

"There is a rule of common honesty which should run with the dealings of men, and this requires that the truth be told, and when this is not done, and one person is let to lose and another to profit by false representations inducing contract relations, and the fruit of the iniquity comes to headquarters, the court of equity is little apt to pay attention to mere intermediaries between the person wronged and the one who has profited thereby, and insists on keeping the gain."

In *Hartman* v. *City Nat. Bank*, 219 Cal. 510, 27 P. (2d) 764, the corporation was held liable for the fraud of its agent upon facts similar to the case at bar. See, also, Pomeroy Eq. Jur. p. 905; 14 C. J. 614, 615.

The evidence fails to show the exact amount of the Skola money which the corporations received. It does appear, however, that they received a substantial part. Having received some part of the money and having participated in the fraud, they are liable to plaintiff for the full amount of his claim. *Hartman* v. *City Nat. Bank*, supra. As said in

the case of *Goodin* v. *Palace Store Co.*, 164 Wash. 625, 4 P. (2d) 493, the question is not one of degree, but if the corporation received benefits in any measure, it would be liable. See, also, *Mack* v. *Latta et al.*, 178 N. Y. 525, 71 N. E. 97, 67 L. R. A. 126.

Defendants contend that plaintiff has waived and is estopped to assert any right to rescind. The stock was purchased September 14, 1929, and the rescission attempted the latter part of June, 1932. During all of that time plaintiff was being assured by defendants that the company was making fine progress and he should not bother himself about its affairs. He was assured when he took the Merrill Mortuaries stock that it was the same as the Deseret Mortuary stock. Of course, had he made proper inquiries he might have discovered that the church and its leaders were not financially interested in the company. But there appeared to be no occasion for such inquiries in view of the assurance he was receiving from defendants. Nor was he required to make an investigation to ascertain the truth or falsity of the representations made. He had a right to rely on the representations as being true. *Guaranty Mortgage Co.* v. *Ellison*, 66 Utah 1, 239 P. 29. Likewise, plaintiff was not required to exercise vigilance after the sale to discover the fraud. *Anderson* v. *Frischkorn Real Estate Co.*, 253 Mich. 668, 235 N. W. 894.

Lapse of time may or may not be sufficient to constitute a waiver of the right to rescind, depending upon the circumstances, including a change in the conditions and relative positions of the parties. *Burningham* v. *Burke*, supra. There appear to me to be no facts in this case which would warrant me in holding that either the lapse of time or any dealing with the stock prior to June 1932, constituted a waiver of plaintiff's right to rescind or an estoppel.

After plaintiff became aware that the church was not financially interested in the company, he delivered a share of stock which he had sold under a written agreement made several months before. He also endorsed and delivered the

stock to Aures, and later he pledged two shares to obtain money to pay Aures' lawyer. It was after this last share had been delivered and when it became known that no more money could be obtained from defendants that plaintiff's wife informed him of her part in the transaction. While it is not clear, the inference is that he then also discovered that the church officials were not financially interested in the company. In other words, it was then that he became fully apprised of the real nature of the fraud practiced upon him. It cannot be said as a matter of law that because a part of the representations were known by him to be false before this last share was delivered that this constituted a ratification of the sale and evidenced an intent to be bound by the sale so as to work a waiver or estoppel. It was still a question of fact to be determined from all of the evidence. *Anderson* v. *Frischkorn Real Estate Co.*, supra. Under the evidence, I am not prepared to say, contrary to the findings of the trial court, that the delivery of the share of stock must be regarded as such conduct as would preclude a recovery by way of estoppel. Besides, the share of stock was delivered at a price agreed upon. The practical effect of such transfer is exactly the same as would result from delivering the stock by way of rescission, so there could be no prejudice to defendants arising from a failure to rescind before the delivery of this one share.

In order to rely on an estoppel, it was necessary for defendants to prove that plaintiff's conduct in relation to the stock, after discovery of the fraud was inconsistent with an intention to rescind. 14 C. J. 595; *Harn* v. *Smith*, 85 Okl. 137, 204 P. 642. The transfer and delivery of the stock to Aures was found by the trial court to be merely for the purpose of collecting plaintiff's money and restoring the stock to defendants. I feel the evidence sustains this finding and that no estoppel or waiver can be predicated on such action. When it appeared that Aures was getting nowhere, plaintiff demanded and received his stock back, but was compelled to pay $200 to Aures' lawyer, a circumstance in itself strongly

indicating that Aures was to collect for plaintiff and did not own the stock. The pledging of two shares to obtain money to pay that charge so as to get his stock back did not amount to a waiver or estoppel of his right to rescind, for the only purpose was to get his stock so that he could restore it to defendants.

I am of the opinion that the representations to plaintiff concerning the church and its leaders being financially interested in the company and that for that reason plaintiff could not lose anything amounted to representations of material facts calculated to induce and actually inducing plaintiff to buy the stock. Since they were false, plaintiff is entitled to rescind. *Munson* v. *Fishburn*, 183 Cal. 206, 190 P. 808; *Williams* v. *Myers*, 110 Cal. App. 265, 294 P. 61; *Goodin* v. *Palace Store Co.*, supra; *California Credit & Collection Corporation* v. *Goodin*, 76 Cal. App. 785, 246 P. 121; *State Bank of Indiana* v. *Cook*, 125 Iowa, 111, 100 N. W. 72; *Alabama Foundry & M. Works* v. *Dallas*, 127 Ala. 513, 29 So. 459; *Webb* v. *Tri-State Fair & Racing Ass'n*, 238 Ky. 87, 36 S. W. (2d) 839; *Guaranty Mortgage Co.* v. *Ellison*, supra. In addition to this, there is the fraud and duress practiced through plaintiff's wife. I have heretofore indicated that the evidence is sufficient to sustain the court's findings that the above representations were made and that they were relied upon and that plaintiff acted under duress. It becomes unnecessary, therefore, to determine whether the representations as to plaintiff doubling his money each year amounted to a false representation of fact or is to be considered as mere "puffing," since the other misrepresentations furnish sufficient grounds for rescission.

Defendants strenuously argue that since the stock was issued in the names of Skola and his wife jointly there was no valid tender of the stock by Skola, and, further, that Mrs. Skola is a necessary party to the action. It may be conceded that one of two joint obligors alone may not rescind the contract. However, such rule of law has no application here, as the court found that Mrs. Skola acquired no interest in

the stock because of the duress practiced upon plaintiff when his wife's name was inserted in the certificates. Defendants were aware of and assisted in this duress. They knew plaintiff did not make any voluntary transfer or gift of this stock to his wife, and that she was not buying any stock. They cannot now defeat plaintiff in his right to recover his own money by trying to uphold their own misdeeds and out of them create rights which can have no substance.

Plaintiff has contended that there is no certification by the trial judge that the bill of exceptions contains all the evidence introduced, and hence the findings of the trial court must be presumed to be sustained by the evidence. The stenographer's certificate recites that the transcript "constitutes a full, true and correct report of the proceedings." The record as a whole indicates that all the evidence adduced at the trial is before the court. While I think that the proper way is to have the judge make a specific certification that the bill of exceptions contains all of the evidence adduced, yet, in view of the stenographer's certificate and the record as a whole, I do not feel that I can indulge the presumption that there was more evidence than that contained in the bill of exceptions and the exhibits referred to and attached. *Mitchell* v. *Jensen,* 29 Utah 346, 81 P. 165; *Karenius* v. *Merchants' Protective Ass'n,* 65 Utah 183, 235 P. 880. I have considered the case, therefore, upon the record before me.

I feel that what has been said sufficiently disposes of the questions before us on this appeal. Accordingly, I am of the opinion that the judgment of the trial court should be affirmed.

MOFFAT, Justice (dissenting).

I concur in the views expressed in the dissenting opinion of Mr. Justice EPHRAIM HANSON.